PEOPLE *v.* THOMPSON.[1]

122    411,
s81ᴺᵂ  344,
129    ⁶294
122    411,
s81ᴺᵂ  344
133    ¹551,
122    411
d134 ¹410

1. GRAND JURY—CHALLENGES—INDICTMENT—PLEA IN ABATEMENT.
   Upon a plea in abatement to an indictment, only those objections going to the competency of jurors can be raised which, under 3 Comp. Laws 1897, §§ 11881, 11882, would have been good ground for challenge, viz., that a juror was prosecutor or complainant.

2. SAME—NUMBER OF JURORS—WAYNE COUNTY JURY ACT.
   Section 23 of the Wayne county jury act (Act No. 95, Pub. Acts 1887), which provides for drawing the names of 23 persons to serve as grand jurors, was not designed to modify the general law (3 Comp. Laws 1897, § 11879), under which "not less than 16 persons" are required "to be sworn" on any grand jury; therefore, an indictment found in Wayne county is not invalid because the jury returning it was composed of only 21 persons.

3. SAME—PROCEEDINGS—SECRECY—STIPULATION.
   Since public policy forbids a prosecuting officer to divulge his knowledge of what testimony was taken before a grand jury as the basis for an indictment, the courts will refuse to consider a stipulation purporting to set out such testimony, and signed by the prosecuting attorney, though pre-

---

[1] Respondent's application for a rehearing upon the question whether he was entitled to a directed verdict was denied April 3, 1900.

sented for the purpose of expediting the hearing on a plea in abatement.

4. CRIMINAL LAW—MANSLAUGHTER—BOILER EXPLOSION—CAUSE— QUESTION FOR JURY.

On the trial of an indictment for manslaughter, charging that the killing resulted from a steam-boiler explosion, caused by overpressure of steam, due to the willful negligence of the respondent in failing to regulate the safety-valve, and in leaving the boilers unattended, where experts' testimony that the explosion was due to the causes alleged was contradicted by respondent's witnesses, who testified that the explosion was due to other causes, and that the respondent could have done nothing to avoid it if present, it was proper to submit the issues raised by the testimony to the jury, though the people's witnesses did not have that technical scientific knowledge possessed by the witnesses for the defense.

5. SAME—TRIAL—COMPETENCY OF EVIDENCE—INSTRUCTIONS.

Where testimony which was inadmissible except for a single purpose was received throughout a criminal trial under rulings which were calculated to give the jury an erroneous impression, prejudicial to respondent, as to the purpose for which it was competent, the error was not cured by an obscure reference in the general charge to its proper purpose.

6. SAME—PROOF OF OTHER OFFENSES—NEGLIGENCE—INTENT.

On the trial of an engineer for manslaughter in leaving steam-boilers unattended until the high pressure produced an explosion causing death, where respondent denied that his absenting himself on the occasion in question was negligent, it was error. to admit proof of other occasions when he had negligently left the boilers unattended, since negligence could not be inferred from his conduct on prior occasions, and .the case was not one for characterizing the intent by such proof. *People* v. *Seaman*, 107 Mich. 348, distinguished.

7. SAME—WARNINGS.

It was proper, however, as bearing upon the question of respondent's recklessness on the occasion in question, to show that he had been warned that danger would follow his absence from the boiler-room.

8. SAME—FUEL FOR BOILERS—COMPARISONS.

On the trial of an engineer for manslaughter in leaving unattended steam-boilers, under which oil was used for fuel, until the high pressure produced an explosion causing death, it was error to admit evidence of comparisons between the use of

coal and oil for generating steam, since a showing of how quickly steam may be raised with coal affords no light as to one's duty in attending boilers fired with oil.

9. SAME—EXPERT TESTIMONY—EXPERIMENTS—IDENTITY OF CONDITIONS.

Upon such prosecution, however, where an expert had given his opinion as to the cause of the explosion, it afforded no ground for excluding his testimony, in support of the opinion, as to the results of experiments made by him to ascertain within what time a given pressure of steam could be raised in a boiler by the use of oil as fuel, that the conditions under which the experiments were made were not identical with those existing with respect to the exploded boiler.

10. SAME—EVIDENCE.

While it was not error, upon a prosecution for manslaughter in leaving steam-boilers unattended until the pressure produced an explosion causing the death of a person named in the indictment, to show that other persons were killed or injured by the explosion, it was improper to admit testimony in regard to the injured persons' being taken to hospitals, and detained there for a long time.

11. SAME—INSTRUCTIONS. ·

Where respondent in a prosecution for manslaughter was accused of negligently leaving steam-boilers unattended until the pressure produced an explosion causing death, he was entitled, in addition to the general charge, in the main correct, as to what would amount to culpable negligence, to have given a requested instruction that if he had reason to believe, and did believe, from his past experience, that it was consistent with safety for him to be absent from the boilers at the time, he could not be held guilty of the crime.

Exceptions before judgment from recorder's court of Detroit; Chapin, J. Submitted October 26, 1899. Decided December 21, 1899.

Thomas M. Thompson was convicted of manslaughter. Reversed.

*Otto Kirchner*, for appellant.

*Allan H. Frazer*, Prosecuting Attorney, and *Ormond F. Hunt*, Assistant Prosecuting Attorney, for the people.

MOORE, J. The respondent was tried and convicted of manslaughter, in the recorder's court of Detroit, on.an indictment found in the circuit court for the county of Wayne. The case comes here on exceptions before judgment.

The respondent was, in November, 1895, an engineer having charge of two boilers and other machinery in a building on Larned street, in Detroit. On the morning of the 6th of November one of the boilers exploded with terrific force, destroying the building in which it was located. As a result of the explosion, a number of lives were lost. Among the killed was Michael Ward. The grand jury of Wayne county was then in session. In the following January an indictment was found against the respondent. A motion to quash the indictment for various reasons was made and overruled. Thirteen pleas in abatement were then filed. These pleas and motion to quash attacked the validity. of the indictment for various reasons, the most important one of which is that the act creating the jury commission is unconstitutional and void, because in the body of the act certain powers are conferred upon the circuit judge, the sheriff, and the clerk in carrying out the provisions of the act, which powers are not germane to the title of the act. It is contended the proceedings had under the provisions of this act are not simply irregular, but are invalid and void. The act in question was passed in 1893 (Act No. 204, Pub. Acts 1893), and amended in 1895 (Act No. 5, Pub. Acts 1895). Prior to the enactment of this law, and ever since 1887, Wayne county had a board of jury commissioners. After the act of 1893 became a law, a board of jury commissioners has been acting for the county of Wayne under the provisions of the later act. This board has selected the lists from which the petit jurors have been drawn, as well as the grand jury. The first 10 pleas interposed by counsel for respondent were overruled by Judge Lillibridge, he passing upon them upon their merits. In his written opinion he makes this statement:

"I have discussed the several pleas upon the merits, and found that they should be overruled; but, in my opinion, there is another, and more insuperable, objection to all of them, except those made to the qualifications of jurors. I have carefully examined the exhaustive brief submitted by respondent's counsel, but I am not convinced. To my mind, it seems very clear that the word ' challenge,' in sections 9496, 9497, 2 How. Stat., is used in the broad sense of ' objection,' and that the statute was intended to cover objections or challenges, whether raised by challenge before indictment or by a plea in abatement afterwards. There seems to me to be great force in the reasoning of Justice MORSE in *People* v. *Lauder*, 82 Mich., particularly at pages 134, 135. The discussion of this subject, also, in Thomp. & M. Jur. §§ 527–538, convinces me that the purpose of these sections was to prohibit technical objections to the array or persons of grand jurors, except for the cause allowed, whether raised by challenge or by plea in abatement. Every reason of public interest which could be urged against allowing objections to the array or persons of grand jurors by challenge exists with greater force to the allowance of such objection when raised by a plea in abatement. So far as the circuit courts of this State are concerned, it seems to me the language of Mr. Justice MORSE, above referred to, must control, until there is a decision more directly in point."

We do not deem it necessary to add to what was said by Judge Lillibridge, and by Justice MORSE in *People* v. *Lauder*, *supra*, except to cite the cases of *State* v. *Noyes*, 87 Wis. 340 (41 Am. St. Rep. 45), *People* v. *Smith*, 118 Mich. 73, and the recent case of *People* v. *Reigel*, 120 Mich. 78. In the last-named case Justice HOOKER calls attention to the provisions of the statute, and discusses the question at length. The cases sustain the ruling of Judge Lillibridge.

The eleventh plea in abatement alleges, among other things, which is the substance of the plea, "that the said indictment was found and presented by a grand jury composed of less than 23 persons, to wit," etc. Judges Lillibridge, Hosmer, and Carpenter, sitting *en banc*, passed upon this plea, and jointly signed a written opinion, which is in part as follows:

" On the trial of the issues of fact raised by the eleventh plea, as amended, to the indictment, we find it is true, as alleged in said plea, that only 21 persons were sworn on the panel from which the grand jury that found the indictment was chosen. More than that number, to wit, 23 persons, were drawn and summoned, but several were excused for various causes until the number finally sworn and impaneled was only 21. We are of the opinion, however, that this does not invalidate the indictment. We do not construe the provisions of the Wayne county jury act (Pub. Acts 1887, Act No. 95, § 23) as modifying the general statutes of the State in regard to the number of persons required to be sworn in this county to constitute a legal grand jury. There seems to be no doubt that under the general statutes (2 How. Stat. §§ 7562, 9494) a grand jury may be lawfully impaneled, and may act, consisting of any number of persons more than 15 and less than 24. *People* v. *Lauder*, 82 Mich. 132. In our opinion, therefore, judgment should be rendered for the people notwithstanding the above finding."

This ruling is fully justified by the case cited by the learned judges.

For the purpose of expediting the hearing of the first 11 pleas, the assistant prosecuting attorney signed a stipulation as to what testimony was taken before the grand jury. This stipulation was made the basis of the twelfth and thirteenth pleas in abatement, which allege, in substance, that there was not sufficient testimony submitted to the grand jury to authorize them to find an indictment. To the above pleas in abatement an issue of fact was joined. The circuit judges were of the opinion that whatever knowledge the prosecuting attorney had of the proceedings in the grand-jury room he must have obtained either from the jurors or from his attendance in his official capacity, and that, as public policy did not allow him to divulge his knowledge, the stipulation could not be used. In this connection the language of Chief Justice CHAMPLIN in *People* v. *Lauder*, 82 Mich. 121, is very suggestive:

" We do not find it necessary to determine whether the grounds set up and relied on to quash the writ can prop-

erly be raised by plea in abatement, or whether they should not be raised by motion to quash. If issues of fact had been joined upon the pleas, we suggest that very serious obstacles lie in the way of trying such issues. Grand jurors cannot, in general, be questioned as to what took place among or before them while acting as such. The only exceptions existing are made by 2 How. Stat. § 9502. That section permits members of the grand jury to testify upon the trial in two instances: One, where a witness upon the trial has testified before them, they may testify whether the testimony of the witness examined before them is consistent with or different from the evidence given by such witness before the court; and in the other they may be required to disclose the testimony given before them by any person upon complaint against such person for perjury, or upon his trial for such offense. 'Where the statute prescribes the cases in which a grand juror may testify, it is held that he may do so in no other.' 9 Am. & Eng. Enc. Law, p. 17, and cases cited to note 1, p. 18. But neither of these contingencies has arisen in this case. Lauder has not been offered as a witness upon his trial, and cannot be unless he voluntarily presents himself as such; and then he would waive his privilege, and would stand upon the same footing as any other witness. Neither has a complaint been made against him for perjury. So upon the trial of this plea no juryman could be permitted to testify against or for him. Such testimony is not permitted on grounds of public policy. The same immunity extends to the clerk of the grand jury and the prosecuting officer, if present at their deliberations. 2 Best, Ev. § 579; 1 Tayl. Ev. § 863; 1 Greenl. Ev. § 252. The statute further declares that in no case can a member of the grand jury be obliged or allowed to testify or declare in what manner he or any other member voted on any question before them, or what opinions were expressed by any juror in relation to any such question. The same principle of public policy would not permit a witness who was present in the grand-jury room to testify in any case where a grand juror could not testify. How, then, could it be proved that Lauder gave testimony material to the case upon which the jury found the indictment, or how could it be proved that the grand jury found the indictment upon his and the testimony of the other witnesses? The latter fact is quite beyond the knowledge of Lauder, if he could be deemed a competent witness, which I do not think he would be."

122 MICH.—27.

See, also, *People* v. *O'Neill*, 107 Mich. 556, 560, 561; Thomp. & M. Jur. § 707; *Stewart* v. *State*, 24 Ind. 142; *Creek* v. *State*, Id. 151; *Kingsbury* v. *State*, 37 Tex. Cr. App. 259; *State* v. *Fowler*, 52 Iowa, 103; *State* v. *Smith*, 74 Iowa, 584; *Jones* v. *State*, 81 Ala. 79; *Washington* v. *State*, 63 Ala. 189; *State* v. *Fasset*, 16 Conn. 457; *U. S.* v. *Brown*, 1 Sawy. 531; *U. S.* v. *Reed*, 2 Blatchf. 435.

1 Bish. Cr. Proc. (3d Ed.) § 864, lays down the following doctrine:

"Grand jurors are authorized to find an indictment on their personal knowledge, with no superadded testimony; and this they were 'anciently in the habit of doing.'"

The same author says, at section 872:

"Indeed, the doctrine appears to be general that the court cannot inquire into the sufficiency of the proof, or the mode of examining the witnesses, to invalidate an indictment."

It was not competent for the prosecuting attorney to disclose what occurred in the jury-room, and the court very properly refused to act upon the stipulation.

We now take up the assignments of error alleged to have occurred upon the trial before a jury. It is very strenuously urged here that the circuit judge ought to have directed a verdict in favor of the respondent because there was no competent evidence to sustain the charge made in the indictment. To properly dispose of this contention, it is necessary to give attention to the claims of the people and the respondent, respectively. On the part of the people it is alleged that the boilers had been officially inspected and approved; that it was permitted to carry 80 pounds of steam in them; that the firing was done by means of a spray of oil and a jet of steam. It is claimed that, upon the morning in question, the respondent, after starting his fire, went away from the boiler-room, and remained away so long that an enormous pressure of steam was generated in the boiler. It is urged that, for

five or ten minutes before the catastrophe occurred, a noise was heard in the boiler-room indicating the pressure upon the boilers was too great, and that, if the engineer had been present, this noise would have been a warning to him, so he might have taken the necessary precautions to avoid the danger. It is also claimed that the appearance of the boiler and of the wrecked building and machinery immediately after the accident indicates very clearly the explosion was caused by an enormous pressure of steam in the boilers. It is said that all these things, taken together, indicate the explosion was caused by the criminal negligence of the respondent in his allowing the boiler to remain unattended too long. Upon the part of the respondent it is claimed the boiler was allowed to carry 80 pounds of steam; was supplied with a safety-valve; that the arrangement for firing was so adjusted that the firing could be made almost automatic,—so that an absence such as that of the respondent upon the morning of the accident was not negligent. It was his claim that he had to look after the other machinery in the building, including the heating apparatus and the elevators, which required his absence from the engine-room at times. He urges that, a day or two before the explosion, there was a leak about the cast-iron manhole of the boiler, and to obviate the leak it was necessary to apply a wrench to the bolt which drew the plate into place, the probable effect of which was to weaken, or perhaps break, the cast-iron manhole's ring; that when the steam was generated in the boiler so as to subject it to some pressure, which might have been some less than the 80 pounds which the boiler was allowed to carry, a fracture and opening occurred at the manhole, which suddenly released the pressure upon the water in the boiler, when the latent heat stored in the water of the boiler converted, almost instantly, a large portion of the water into steam, when the explosion followed. He claims his absence from the boiler-room was not negligence, and did not cause the explosion. Very soon after the explosion occurred, experts were upon the ground, looking after the

interests of the people and various parties.    Careful observations were made of the effect of the explosion, not only upon the building, but upon the boilers themselves.    Prof. Cooley was one of these experts.    He was called as a witness upon the part of the respondent, and testified:

"The rupture started in the manhole ring.    The manhole ring gave way suddenly, and probably released the manhole plate, with which release the pressure of the boiler was suddenly reduced.    With that sudden reduction of pressure there was a formation of steam throughout the mass of water in the boiler, which carried the water out through the manhole opening, and ruptured the seam the rest of the way.    This all took place presumably within one or two seconds, or less. * * * The manhole ring was without doubt a weak point in the boiler; weaker than any other point; weaker than the horizontal seam, which, in a normal boiler, is the weakest part of the boiler.    This manhole ring was subjected to pressure due to screwing up the manhole plate, making a joint between the manhole plate and the manhole ring, which pressure produced in the metal of the manhole ring stresses very considerable in amount, quite in excess of the stresses which would be placed in cast iron under even ordinary conditions; much greater than would be placed on cast iron when used as a manhole ring. * * * It gave way.    It gave way suddenly, and all at once; and, having given way, the remainder of the sheath,—that is, the steel and the rear section of the boiler,—was not sufficiently strong to withstand the sudden generation of force in the boiler, and the seam was torn, or the sheath was torn, its entire length, opening up on the rear head and on the seam of the middle section,— opening up and turning down, as has been shown by the model."

It was his opinion that such an absence as was shown upon this occasion was not negligence, and that, if the engineer had been in the engine-room, he could have done nothing to avoid the catastrophe.    Testimony of other eminent experts was to the same effect, one of them expressing the opinion that, if Mr. Thompson had been in the engine-room, he would not have lived to be tried for manslaughter.

It is claimed this testimony is not contradicted by any competent evidence. It is true that, upon the cross-examination of the witnesses for the people, they did not show that technical knowledge of the laws which govern the conversion of water into steam under varying pressures, or of the various theories in relation to the cause of explosions, possessed by the witnesses for the respondent. These witnesses had, however, experience in the construction of boilers and in their management. They visited the place where the explosion occurred, and observed its results. They examined the boilers themselves, and it was their opinion the explosion was the result of a very high pressure of steam. We cannot say that this testimony, taken in connection with what the witnesses for the people testified Mr. Thompson did and failed to do, and with the results caused by the explosion itself, failed to make a case on the part of the people. The testimony raised an issue of fact, which it was the duty of the judge to submit to the jury.

In the progress of the trial, testimony was offered for the purpose of showing the respondent had been guilty of acts of negligence by absenting himself from the boiler-room upon other occasions prior to the morning of the explosion. Objection was made to this testimony, for the reason that: "Whatever Mr. Thompson did on previous days had nothing to do with the result upon this day. The question is what he did upon the 6th day of November, 1895. What he did or failed to do upon other days has nothing to do with this issue at all,"—when the following occurred:

"*The Court:* It seems to me, this question seeks to show a course of conduct on the part of the accused rather than an intent, and I am inclined to view the testimony as competent, and as tending to show that the bursting of the boiler was not accidental, but the result of negligence on the part of the accused. I confess I am somewhat in doubt about it.

"*Mr. Robison:* Boilers don't burst on account of the course of conduct.

"*Mr. Kirchner:* Does your honor hold, because Mr. Thompson was absent from the boiler on the 3d, 4th, 5th of November, that that would have any relation to the bursting of the boiler on the 6th of November?

"*Mr. Frazer:* It shows his recklessness.

"*The Court:* It tends to show a course of careless conduct. If he was negligent on the 4th, 5th, or 6th, it might tend to show he was on the 6th or 7th. It might be that is wrong, but that is my view of it. I will give you an exception.

"*Mr. Kirchner:* I will except not only to the admission of the testimony, but to the reason stated by the court in the hearing of the jury."

Under this ruling a mass of testimony, covering a good many occasions, and extending over a long period of time, was introduced, tending to show that Mr. Thompson was absent from the boiler-room under such conditions that his absence was negligence, and that upon at least one occasion he had been warned that disastrous results would follow his conduct. The respondent gave his version of these absences, so far as he could recall them; his testimony tending to show that they were not of a negligent character, and that usually some one was left in charge of the boiler when he was away. The court was asked to charge, in relation to this testimony, as follows:

"For the purpose of determining whether the respondent is guilty of negligence, as charged in the indictment, you are not at liberty to consider whether, on days and times before the explosion, the respondent had been: (*a*) Negligent in the operation or care of his boiler in any manner; nor (*b*) whether he had been drinking rum; nor (*c*) whether, while the boiler was in operation, he ever stood in the alley for any reason; nor (*d*) whether, while the boiler was in operation, he ever stood on the front steps of the Journal Building; nor (*e*) whether he ever left the boiler in charge of others; nor (*f*) whether, while the boiler was in operation, he slept in the boiler-room; nor (*g*) whether he ever absented himself from the boiler during the noon hour."

He declined to do so, and charged the jury as follows:

"There is one request, or a subdivision of one of the

requests, as to the weight or consideration that certain testimony should receive at the hands of the jury, viz., as to what Thompson did or did not do prior to the 6th day of November, 1895,—the day on which it is alleged the boiler exploded. The people were permitted to show what Thompson did or failed to do prior to that time. I will state to you that it was permitted for the purpose of showing the character of the man, and as to what he was accustomed to do, and as tending to show what he might have done upon this 6th day of November; but he is not charged with being negligent on any day but the 6th day of November, and it will matter not how negligent he may have been at other times. Unless you are satisfied from the evidence in this case, beyond a reasonable doubt, that he was negligent on the 6th day of November, and that, as a result of such negligence on his part, the boiler in question exploded, and the death of Michael Ward resulted therefrom, your verdict should be, 'Not guilty.' He is charged with manslaughter, for having caused the death of Michael Ward on the 6th day of November, and that the death resulted from the negligence of Thompson; and unless you find that beyond a reasonable doubt, as I say, your verdict should be, 'Not guilty.' But if all the evidence in this case satisfies you, beyond a reasonable doubt, that he was guilty of neglect on that day, and that negligence resulted in the death of Ward, then your verdict will be, 'Guilty.' You may follow the officer, gentlemen.

"*Mr. Hunt:* I think you misspoke yourself on that point about the other acts of negligence. In the *Seaman Case* the Supreme Court said it was for the purpose of determining whether this was willful and reckless.

"*The Court:* That is what I meant when I said 'the character of the man.'

"*Mr. Hunt:* No; that don't cover it, I don't think.

"*The Court:* I stated to you, gentlemen, the purpose of admitting that testimony was for the purpose of showing the character of the man. What I mean by that is, what was the conduct, and what was the customary and usual conduct, of the man in the operation of his boilers, as tending to show whether or not his negligence, if it was negligence, on the 6th day of November, was willful. That is what I mean. You may follow the officer."

It is very evident that, during nearly all of this long

trial, the judge and jury were under the impression that the negligence of Mr. Thompson on the 6th of November might be presumed if he was shown to be negligent upon prior occasions. It was not until just before the jury were sent out that they were told this testimony was competent only as bearing upon the question of whether the negligence of Mr. Thompson on the morning of the explosion was willful, and this statement was not so clearly made as to be likely to remove from the minds of the jury the wrong impression entertained by the trial judge and the jury up to that time.

Counsel for the people say, in relation to this feature of the case:

"In the case at bar it is not charged that Thompson 'did willfully kill and slay' Michael Ward; that would be murder; but that he did 'willfully * * * neglect to give vigilant and constant care and attention.' It is the willfulness of the negligence resulting in the death that is charged. In the case of *People* v. *Seaman*, 107 Mich. 348 (61 Am. St. Rep. 326), it was not charged that Seaman did willfully kill Emily Hall. That would have been murder. It was charged that he willfully did an unlawful act, which inadvertently resulted in causing a death. In the indictment at bar it is charged that Thompson willfully did an act,—absented himself from his boilers,—which act, under the facts and circumstances set forth, made it an unlawful act, which inadvertently resulted in causing a death. The two cases are analogous in principle. McGRATH, C. J., in delivering the opinion of the court in the *Seaman Case*, says, at page 357, 107 Mich. :

" ' Where it is necessary to show a particular intent in order to establish the offense charged, proof of previous acts of the same kind is admissible for the purpose of proving guilty knowledge or intent.'

"It is unnecessary to cite all the cases analyzed by the court in the above opinion, which enforces the doctrine for which we contend. The above case is referred to with approval upon this point in *People* v. *Thacker*, 108 Mich. 652, at page 663; *People* v. *Macard*, 109 Mich. 623, at page 630; *People* v *Abbott*, 116 Mich. 263, at page 270."

Even if the argument of counsel is correct, it is evident that the wrong done the respondent by the admission of this testimony, accompanied by the reason assigned by the judge for its admission, was not cured by the attempt of the judge to cure the wrong impression at nearly the close of his charge. But are the cases cited by counsel, and this case, analogous, either as to the facts or as to the principles of law governing them? There is no claim that respondent intended to bring about the death of Mr. Ward, or any one else. Nor is there any claim that he intended to explode the boilers. The respondent does not claim, nor does he introduce any evidence tending to show, that his absence from the boiler-room upon the morning in question was not intended by him. He gives his version of the condition of the boiler, and of the fire, and of the length of time he was absent, and insists that, under all the circumstances, his act was not negligence. The question would seem to resolve itself into this: Is it proper, for the purpose of proving one act of negligence, to show other acts of negligence upon prior occasions? The law applicable to such a condition is so well collated in the brief of counsel for respondent that we insert portions of his brief here:

"The authorities are uniform, in this State and elsewhere, that an act of negligence cannot be proven by, or inferred from, previous acts of negligence. *Grand Rapids, etc., R. Co.* v. *Huntley*, 38 Mich. 537 (31 Am. Rep. 321), was an action by a passenger to recover damages for a personal injury. To prove the carrier's negligence, plaintiff attempted to show a defective track. The court said:

" 'We are also of opinion that no defects in the track could be relied on to show negligence contributing to the accident, except those existing where the track was injured or displaced, and that testimony as to the condition of the road away from the scene of the injury was improper to make out a cause of action, and could only tend to raise false issues. The testimony should be confined to the time, as well as place, of the accident.'

"*Michigan Cent. R. Co.* v. *Gilbert*, 46 Mich. 176: Gilbert was an engineer in charge of one of the railroad

company's trains. He was killed by a collision, caused by the alleged carelessness of one Colwell, who was the company's yardsman at Jackson, where the injury occurred. To show that Colwell was incompetent and that the railroad company knew of his incompetency, plaintiff proved a special instance of Colwell's carelessness. The court, in speaking of this testimony, said:

"'It was not claimed in support of such testimony, and certainly it could not well be, that it had any tendency to prove that he [Colwell] was negligent in fact on the night of the collision.'

"In *Guggenheim* v. *Railway Co.*, 66 Mich. 150,—an action for causing the death of plaintiff's intestate by running him down at a railroad crossing,—it was urged in defense, among other things, that deceased, by his own negligence, contributed to his death. This court said:

"'Nor had the injury anything to do with the habits of care or want of care of Manheimer [the deceased] in crossing at this point at other times. The inquiry was legitimately confined to the crossing at this particular time when his death occurred. It could not avail his administrator, in this action, how careful he had been in crossing at other times, if he was negligent on this occasion; nor could the liability of the defendant be lessened if it were negligent and Manheimer was not negligent, at the time of his death, by the fact that he had been careless in crossing the track at some other time.'

"*McNally* v. *Colwell*, 91 Mich. 527 (30 Am. St. Rep. 494), was an action to recover the value of lumber destroyed by fire through the alleged negligence of defendant. The trial court submitted to the jury this question:

"'Was the defendant negligent in knowingly employing an engineer and fireman in the mill who were incompetent to perform their duties by reason of their use of intoxicating liquors?'

"This court held that the question was improperly submitted. This court said:

"'There was testimony tending to show that the engineer and fireman were in the habit of using intoxicating liquors, and were sometimes seen under the influence of such liquors; but such liquor habit or occasional intoxication was not shown to have had any bearing whatever upon the origin of the fire, or to have had anything to do towards preventing its extinction.'

"*Williams* v. *Edmunds*, 75 Mich. 92: The plaintiff sought to recover damages for injury received as the result of the negligent driving of defendant's servant. There was evidence tending to show that the driver was drunk at the time of the accident. Held, in such a case, the general character of the servant for sobriety is not in issue, and cannot be shown, any more than his general character as a careful driver.

"*Boick* v. *Bissell*, 80 Mich. 260, was an action to recover damages to plaintiff, alleged to have been sustained through the negligent driving of defendant's servant. Held, that the reputation of the defendant's driver as a careful driver was not in issue, and not material.

"*Langworthy* v. *Township of Green*, 88 Mich. 207, was an action to recover damages sustained while driving over an alleged defective highway. A witness for defendant said he knew plaintiff, and knew about his habits of driving. Counsel then asked as to what he could say as to the plaintiff's manner and method of driving his horses. The trial court excluded the testimony. This court said:

" 'The court very properly excluded the testimony. The fact that plaintiff was generally a careful driver could not excuse negligent driving on this occasion, nor could the opinion of a witness as to his habits on other occasions be admitted to establish his negligence on this occasion.'

"*Hatt* v. *Nay*, 144 Mass. 186: Plaintiff, while in defendant's employ, was injured through the alleged negligence of defendant's foreman. The plaintiff desired to prove certain specific acts of carelessness on the part of the foreman, before the accident happened, while engaged on the same job. The court held the evidence had been properly excluded.

" 'Because a servant may have been guilty of negligence on certain specified occasions, it by no means follows that he was on the occasion in question, or that he might not ordinarily be a careful and skillful workman, and properly employed as such. The investigation of other individual acts of alleged carelessness on the foreman's part would necessarily have a tendency to confuse the case by collateral inquiries, to protract it indefinitely, if those inquiries were carefully made, and to mislead and distract a court or jury from the true issue '

"*Kennedy* v. *Spring*, 160 Mass. 203, was an action to recover for personal injuries sustained by the plaintiff, while in the defendant's employ, by falling from a staging upon the roof of a house. The staging had been erected for the purpose of building a chimney. The plaintiff offered to show that defendant's son, who built the staging, had previously built other staging that had fallen down, for the purpose of showing that the son was not a competent person to put up the staging. Held, that the evidence was not admissible for that purpose.

"*Christensen* v. *Union Trunk Line*, 6 Wash. 75, was an action to recover damages sustained by a collision with a street car. The court said:

" ' It is contended that the court erred in permitting the plaintiff to show that this particular motorman had run his car at a high rate of speed upon other occasions, and we think the court did err in so doing. It was a fact collateral and irrelevant to the issue, and one which the defendant could not be expected to be prepared to rebut without previous notice.'

"*T. & H. Pueblo Building Co.* v. *Klein*, 5 Colo. App. 348, was an action to recover damages for causing death. The deceased was, at the time of her death, only six years of age. She was killed in defendant's elevator, which it was alleged was improperly operated, and also improperly constructed. The deceased was accompanied by her brother, who was nine years of age. One of the witnesses for the plaintiff was asked the following question:

" ' You can state, from your observation in riding up in the elevator at the Central Block, how the elevator was generally started by that young man.'

"The question having been objected to, the trial court said:

" ' The court admits the evidence solely for the purpose of determining what can be done with the elevator, and how it can be operated; and the jury are specifically told that the proof of negligence, if it shall be shown that the elevator could be operated negligently and dangerously upon any other occasion, will not be evidence that it was on this occasion so operated.'

"Witness then testified that he noticed a very marked contrast between the boy that operated the elevator at the time of the accident and another boy who sometimes operated it; and that, almost as soon as the witness stepped in-

to the elevator, this boy seemed to be very careless, and for some reason started it at full speed. The witness then testified to several acts of negligence of the elevator boy on other occasions. The appellate court, in commenting upon the admission of this evidence, said:

" 'The testimony of Saunders was clearly inadmissible. The only negligence charged was that of the elevator boy on the occasion of the accident. No other negligence was in issue. If he was negligent then, it would have been no defense that he had always before been careful. If he was not negligent then, it was entirely immaterial how habitually or recklessly negligent he might have been prior to that time. The effect of the testimony upon the jury must have been unfavorable to the defendant.' "

See, also, *Little Rock, etc., R. Co.* v. *Harrell*, 58 Ark. 454; *Gulf, etc., R. Co.* v. *Ogg*, 8 Tex. Civ. App. 285; *Atlanta, etc., R. Co.* v. *Smith*, 94 Ga. 107; *East Tennessee, etc., R. Co.* v. *Kane*, 92 Ga. 187 (22 L. R. A. 315); *Louisville, etc., R. Co.* v. *Berry*, 88 Ky. 222 (21 Am. St. Rep. 329); *Adams* v. *Railway Co.*, 93 Iowa, 565; *Carr* v. *Railway Co.*, 163 Mass. 360; *Jagger* v. *Bank*, 53 Minn. 386; *Hall* v. *Rankin*, 87 Iowa, 261.

In *People* v. *Seaman, supra*, there is a full collation of the authorities showing when proof of another felony than the one charged in the indictment is admissible. The case at bar is not one of them, and we think all this testimony was improperly admitted. We think, however, it was competent, as bearing upon the question of his recklessness, to show that he had been warned that danger would follow his absence from the boiler-room.

The court received evidence of comparisons between the use of coal and oil as fuel under steam-boilers. It is difficult to see how this was pertinent testimony. Coal was not used under these boilers. How quickly steam could be made with coal would not afford much light upon the question of firing with oil. The testimony was inadmissible. *McCormick Harvesting-Machine Co.* v. *Cochran*, 64 Mich. 636.

Evidence was admitted of the results of experiments made to ascertain within what time a given pressure of

steam could be raised in a boiler by the use of oil as fuel. This is said to be error, for the reason that the conditions under which the experiments were made were dissimilar from those which existed under the boiler in question, and that the reception of the testimony was damaging; counsel citing *Yates* v. *People*, 32 N. Y. 509, *Hoyt* v. *Jeffers*, 30 Mich. 181, *Patrick* v. *Howard*, 47 Mich. 45, and many other cases. We have already intimated that it would be competent to show the effect of the use of oil as fuel as bearing upon the question of whether the absence of Mr. Thompson from the boiler-room was negligent. The record does not show that it was contended or argued that, because steam could, by the use of oil as fuel under one boiler, be raised in a given time, therefore it would have a like effect under the boiler which was in charge of Mr. Thompson. The results of the experiments were given as showing the qualifications of the witnesses who testified as to the probable effect of the firing of the boiler in question in the manner in which it was fired. It is contended by the counsel for the people as follows:

"In a case involving negligence, experiments are admissible to prove: (1) That from given conditions a certain result would follow; (2) that from given conditions an alleged result would not or need not follow; and (3) in support or in explanation of opinion evidence. If an experiment had been introduced for either one of the first two purposes, counsel for respondent would have been correct in demanding that the similarity of conditions must first have been shown, and the cases cited by counsel are in harmony with the weight of authority. When, however, a witness has given his opinion, the weight of authority is that he may also be permitted to testify as to the grounds of the opinion expressed, which includes evidence of experiments during the course of his investigation of the subject to which his testimony relates. See *Farmers & Merchants' Bank* v. *Young*, 36 Iowa, 47; *Dickenson* v. *Inhabitants of Fitchburg*, 13 Gray, 555; *Williams* v. *City of Taunton*, 125 Mass. 34; *McKay* v. *Lasher*, 121 N. Y. 477; *Collier* v. *Simpson*, 5 Car. & P. 73; *State* v. *Jones*, 41 Kan. 309."

In 12 Am. & Eng. Enc. Law (2d Ed.), 409, there is a collation of the cases bearing upon this subject. At page 410 it is said:

" Evidence of experiments in support of opinion evidence is admissible, that the court and jury may perceive the force of the witness' reasoning, the soundness or fallacy of his logic, and in such manner judge of his capacity to give an opinion on the subject, the correctness of his conclusions, and, consequently, the weight due the opinion expressed.

" It has been held that an expert who has testified to his opinion in a matter at issue, as ascertained by experiments, will not be permitted to state, in his examination in chief, the details of the experiments upon which his opinion was based, though it was said that, in order to test the accuracy of the witness, he might be interrogated upon the subject on cross-examination. But the general rule, with better reason, is that an expert witness may be permitted, in the first instance, to testify as to the experiments upon which his conclusion is founded. Indeed, it is not inconceivable that a witness might express an opinion, susceptible either of absolute demonstration by an experiment before the jury, or of satisfactory and conclusive support by testimony as to experiments elsewhere made, and yet, unless opposing counsel chose to cross-examine as to experiments, nothing but the bare unsupported opinion of the witness would get to the jury."

We think the testimony was competent.

It is urged that the trial court erred in receiving testimony tending to show: (*a*) That persons other than Michael Ward had either been killed or injured by the explosion; (*b*) that the persons injured suffered, were taken to the hospital, and detained there for a long time. It was competent to show the effect of the explosion, and if, in doing so, it was shown that some persons were killed, and others injured, we do not think it can be said that this was error. *People* v. *Marble*, 38 Mich. 117; *People* v. *Foley*, 64 Mich. 148. We do not see, however, how the testimony about the taking of some of the injured to hospitals, and how long they were there, helped to determine whether Mr. Thompson was criminally negligent

or not. The results of the explosion were very disastrous, and were well calculated to create a feeling of horror, and arouse resentment against any person who might be thought to be responsible for it, and a feeling of great sympathy for those who suffered as a result of it. This testimony was likely to create prejudice against the respondent. Its admission was error.

It is said the court erred in his instructions to the jury as to the degree of care respondent should exercise in his care of the boilers. The court was requested to charge the jury as follows

"The fact of the explosion, and even the possibility of guarding against it, do not necessarily make out a case of culpable negligence. Very few acts in life are done with such care to prevent accidents as would have been possible. The law only requires of any one that degree of care and prudence which persons who are reasonably careful ordinarily observe. To require more would put everybody under restraints in the management of his business, and in his dealings with others, which would be more hurtful in the embarrassments they would cause than beneficial in the protection they could give against injuries."

"Whether the absence of the respondent from his boiler at the time of the explosion was negligent depends upon circumstances. If you find that the respondent, from his past experience, from his knowledge of the boiler, and the flow of oil, and of the burner, had reason to believe, and in fact did believe, that it was consistent with safety to be absent from the boiler, as he was, at the time of the explosion, then he was not, in law, guilty of criminal negligence by reason of such absence."

The judge did not give these requests, but gave a general charge as to what would be culpable negligence, which, in the main, was a correct statement of the law, but it did not instruct the jury upon the particular questions raised in these requests. The requests should have been given. It cannot be that an act done in good faith, based upon what experience has shown to be safe, is criminally negligent. *Schroeder* v. *Car Co.*, 56 Mich. 132; *Cheboygan Lumber Co.* v. *Delta Transportation*

*Co.*, 100 Mich. 16; *Whalen* v. *Railroad Co.*, 114 Mich. 512.

We do not deem it necessary to refer to the other assignments of error. They are either not well taken, or are necessarily decided by what we have already said, or, if error, are of such a character they will not be likely to be repeated.

The conviction is set aside, and a new trial ordered.

The other Justices concurred.