## People's Gas Light and Coke Co. v. Arthur H. Porter.

1. GAS FACTORIES—*Duty of the Proprietors—Not Insurers.*—The proprietors of a gas factory are not insurers of the safety of the consumers of their product. It is their duty to furnish reasonably good and sufficient material, suitable for the purpose for which it is intended and used, and to put in place their conducting pipes in a good and workmanlike manner, and having fulfilled this duty they are not guilty of negligence.

2. RES IPSA LOQUITUR—*Where the Doctrine Does Not Apply.*—The doctrine expressed by the words *res ipsa loquitur* has no application to a cracked or broken gas pipe, though the escaping gas causes the injury to a sleeping occupant of a room, by asphyxiation.

3. EVIDENCE—*Expert Testimony of Physicians.*—In an action for damages resulting from an injury caused by escaping gas, it is error to permit a physician to testify that the condition in which he found the plaintiff *might* have been produced by asphyxiation.

**Trespass on the Case,** for personal injuries. Appeal from the Circuit Court of Cook County; the Hon. FRANK BAKER, Judge presiding. Heard

in this court at the October term, 1901. Reversed and remanded.
Opinion filed June 23, 1902.

WINSTON & MEAGHER, attorneys for appellant; FREDERICK R. BABCOCK, of counsel.

FRANCIS W. WALKER and KENNER & BOREMAN, attorneys for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

Appellee claims to have been injured by the inhalation of illuminating gas, which escaped by reason of the breaking of a pipe or fitting in the night time in the building occupied by him, which breaking he ascribes to the negligence of appellant. He recovered judgment against appellant for the sum of $5,000, from which judgment this appeal is.

Appellee was engaged in the drug business, and occupied certain premises in a building situated at the northeast corner of Woodlawn avenue and Fifty-fifth street, in the city of Chicago. The former is a north and south and the latter an east and west street. The part of the building occupied by him fronts on Fifty-fifth street, and is twenty-two feet in width and from eighty-four to ninety feet in depth. The front part, to the depth of sixty feet, he used as a drug store. The drug store was separated from the rear part by a partition, which was lower than the ceiling. In this rear part was appellee's sleeping room, and it has a side door opening from Woodlawn avenue. Appellee testified, without contradiction, that about one o'clock in the morning of January 27, 1900, he retired to his bed, and that the next he remembered he woke up in the Chicago Hospital at Forty-ninth street and Cottage Grove avenue.

The evidence is that a Mr. Thurston, who had a place of business near to appellee's drug store, was aroused from sleep about three o'clock in the morning and traced the escaping gas to appellee's drug store, and failing to arouse appellee by pounding on the side entrance to his sleeping room, he and another person broke open the front door of the drug store and the door between the drug store and the sleeping room, and on reaching appellee found him uncon-

People's Gas Light & Coke Co. v. Porter.

scious and removed him to Thurston's place of business, whence he was removed to the hospital.

The declaration contains four counts.   As we are of opinion that no recovery can be had on either of the first two counts, we will refer only to the last two.   In the third count, after averring that the defendant constructed the pipes, and the duty of the defendant in the premises, it is averred " that the defendant failed and neglected to erect and construct said gas service pipes leading into and through the building, as aforesaid, in a safe, proper, strong and secure manner, in this: that the said pipes, and the joints and couplings thereof, were so improperly constructed and united, fastened and secured, that the said pipe or pipes, and the joints and couplings thereof, broke, cracked and leaked, at a point in the said premises so occupied by the said plaintiff, as aforesaid, at or near the point where the said pipe emerged from the outer or street wall of the said premises, whereby the gas escaped and leaked from said pipes into the premises so occupied by the plaintiff," etc. The negligence averred in the fourth count is " that the said pipe or pipes, and the couplings and joints thereof, so constructed and erected by the said defendant, and leading into the said premises so occupied by the plaintiff, as aforesaid, were of such weak, insufficient and defective material and character, that the said pipes, at a point at or near where the same emerged from the outer wall of said building or premises, and into the premises or building so occupied by the plaintiff, as aforesaid, broke and cracked, and thereby," etc.

To sustain the third count it was incumbent on the plaintiff to prove, by a preponderance of the evidence, improper construction; and to sustain the fourth it was incumbent on him to prove by a like preponderance that the material used was insufficient and defective, and that the defendant was negligent in the premises.   To sustain the declaration as to improper material and construction, the plaintiff called only two witnesses, Frank Buckle and John Campbell Morrison.   Buckle testified that he had been in the gas fitting

business twenty years, and that he examined the pipe in question about 6:30 o'clock in the morning of January 27th, after the accident. He testified that there was a one and one-half inch supply pipe from the main pipe in Woodlawn avenue, which entered the building about nine feet six inches north of the Fifty-fifth street building line and about nine inches above the surface of the ground; then there was a one and one-half inch by three-eighths inch by one and one-half inch T; then a piece about three feet six inches in length ran up on the wall, on top of which was a one and one-half inch elbow, with a one and one-half and one and one-fourth inch bushing attached to it; then a piece of one and one-fourth inch pipe, about nine feet six inches in length, ran across east to the house pipe. The house pipe was a two-inch pipe, and this was connected with the one and one-fourth inch pipe by a two-inch and one and one-fourth inch T. Witness describes the T as being one casting or one fitting, one end of which was two inches, to connect with the house pipe, and the other one and one-fourth inch to connect with the one and one-fourth inch pipe, and that the smaller part of the T extended toward the west, from where it joined the house pipe, toward the wall where the supply pipe came in from the street; that the smaller end was connected with the one and one-fourth inch pipe. The pipe which rises from the ground up along the wall, where the service pipe enters the building, is called the "riser," and the witness testified that the top of the riser leaned south about six inches; also, that the one and one-fourth inch pipe running from the house pipe to the riser, ran south about two feet from where it would be if it ran across at right angles to the house pipe. Witness testified that when he examined the pipe, at the time mentioned, a piece of the bushing which connected the one and one-fourth inch pipe with the elbow on the riser, and which was screwed into the one and one-fourth inch pipe, was broken off, and that the end of the one and one-fourth inch pipe, in which the piece of bushing was, was lying on the ground, and the other piece of the bushing was in the other end of the pipe where

it connected with the house pipe. The following question was asked the witness by appellee's attorney, and answer given :

" Q. You may state, Mr. Witness, what, in the style of the art at that time, of steam fitting, was the best method, in general use, for the connection of a smaller pipe, when such a connection was to be made.

" A. The proper way would be to put in a reduced fitting, if you wanted to make a smaller line of pipe."

The witness further testified that by a reduced fitting he meant a one and one-half or one and one-fourth inch elbow. The question was objected to, and the objection should have been sustained. The question at issue was whether the connection used was a proper one, not whether a different one would have been better. C. & E. I. R. R. Co. v. Driscoll, 176 Ill. 330.

Witness testified that the bushing used was cast iron, and that, for ordinary gas, cast-iron bushings were ordinarily used; also, that there was no bend in the one and one-fourth inch pipe; and that it was supported only by the two-inch house pipe it went under, and by the elbow and bushing at its west end; that the gas company makes the connections between the service pipes of a building and the house pipes; also that he did not examine the elbow or the T where the one and one-fourth inch pipe connects with the house pipe, and that by turning the elbow, you can change the direction of the pipe.

Morrison testified that he went into the basement where the gas pipes were, in December, 1899, to make an examination of the bulk-heads for the show windows; that he subsequently made measurements; that the point of entrance of the service pipe, from the street into the building, was about twelve feet, three inches, from the south pier of the building, and the house pipe was about eight inches further north; that the angle of the pipe, in crossing the basement, was about eight inches; that the riser leaned south about eight inches, and that the one and one-fourth inch pipe had no support except as heretofore described. The only faults

found by the witness was the want of support of the one
and one-fourth inch pipe, and the fact that it ran northeast
from the riser to the house pipe, which he said caused a
strain at the point of connection with the riser; but he
admitted, on cross-examination, that he did not notice the
elbow on the riser, or in what direction it was turned, and
that, if turned very slightly, it would swing the end of the
one and one-fourth inch pipe a number of inches, and that
if so turned there would be no strain.

From the foregoing it appears that the only criticisms
Buckle made as to the construction were that by a reducing
elbow would have been the proper way to connect the house
pipe with the one and one-fourth inch pipe, and that there
were no supports except by the two-inch house pipe and
the elbow and one and one-fourth inch bushing; and that
the only criticisms of Morrison were that there were no
supports of the one and one-fourth inch pipe except as
stated, and that there was a strain, which last objection he
substantially admitted he was not competent to testify to
for want of proper observation. Neither of the witnesses
testified that the material used was insufficient or unsuit-
able, or that the construction was improper or unusual.

The basement where the pipe was is five feet six inches
in height from the ground floor to the joists supporting the
floor above; the joists run directly east and west and are
from ten to twelve inches apart, and the evidence is that
the one and one-fourth inch pipe ran from the riser to the
house pipe between two of the joists; therefore it could not
have deflected much from an east and west line. The entire
construction of the work for conveying the gas from the
main pipe in Woodlawn avenue to the house pipe occurred
in June, 1899, or about seven months before the accident.
It appears from the evidence that the pipes were malleable
iron, and that the bushing of cast-iron which broke was
three-sixteenths of an inch in thickness. A bushing is
defined thus by Morrison, appellee's witness:

" A bushing is a member for making a connection between
two pipes of different diameter, with a thread outside and
inside to connect the two together."

William Rose, a gas-fitter, testified that he had had fourteen years' experience in the business; that he helped do the work of putting the pipe in place; that he put in the bushing; that he examined it and all the fittings before they were put in place; that he was familiar with the material used, the bushings, coupling, elbows and pipe, and that they were first-class in every way.   Also that there was no crack in the bushing.

In December, 1899, a complaint having been made of gas escaping in the neighborhood of appellee's premises, Frank Hanson and others, employes of appellant, were sent to ascertain where the leak was, and at that time examined the pipe and connections in appellee's premises, but found no leak there.   The leak was discovered somewhere in the street.   Hanson testified that he had worked in the gas-fitting business twenty-six years, and that when he examined the pipe and its connections in December, 1899, the pipes were connected in the usual and ordinary way that house pipes are connected with service pipes in the city of Chicago, and that the materials were of good quality and such as were in ordinary use.

John Griveau, in the gas-fitting business twelve years and who helped put the pipe in place, testified that the bushing was all right and the condition of the threads in it perfect; that the connections were made in the usual way in which such pipes are connected, and that the material used was that in common and ordinary use at the time the work was done.

Three witnesses, Keely, Sullivan and Roberts, visited the premises the day of the accident, after the accident, to repair the pipe, and they all testified that the break was fresh, and that there was no crack in the bushing.   The evidence shows clearly, including appellee's own testimony, that from the time the pipes were put in place in June, 1899, till the early morning of January 27, 1900, there had been no leak in them.   As to whether any support of the one and one-fourth inch pipe, in addition to the fittings of the ends of it to the riser and house pipe was necessary,

Robbins testified that none was necessary; that a man might have safely used the pipe as a turning pole. Rose testified that "a pipe of that kind, outside of its own weight and the weight of the fittings thereto attached, would hold half a ton." The evidence for the defendant is that no strain was caused by the manner in which the one and one-fourth inch pipe was connected with the riser and house pipe, and that there was no strain in fact.

None of the witnesses expressed an opinion as to what caused the bushing to break, and one of them of large experience in the gas-fitting business testified that he could not tell the cause, that it might have been broken by the blow of a hammer, or the application of force in some way.

Waiving the question whether the evidence for the plaintiff, taken alone, would sustain a verdict in his favor, it is sufficient to say that the great weight of the evidence is against the verdict. As the record is, the verdict could be sustained only on one of two theories, namely, that the defendant is liable as an insurer of the absolute sufficiency and safety of the work; or that the mere fact that the bushing broke is sufficient to charge the defendant with negligence. The defendant is not liable as an insurer; its duty was to furnish reasonably good and sufficient material suitable for the purpose for which it was intended and used, and to put the material in place in a good and workmanlike manner. If it fulfilled this duty it was not guilty of negligence. Reiss v. N. Y. Steam Co., 128 N. Y. 103.

The doctrine expressed by the words *res ipsa loquitur* has no application to such cases as the present. Sack v. Dolese, 137 Ill. 129.

But appellee's counsel say that the bushing and pipe were put in evidence, and apparently rely somewhat on that fact. The pipes were not put in evidence connected together and in place as they were when on the premises, and manifestly could not have been; so that the jury, even if competent to pass, by mere inspection, on the question of construction, had no opportunity so to do. But aside from this consideration, the question of the sufficiency of

the material used, and the question as to the construction, whether proper or not, were questions to be determined by the evidence of persons skilled in the gas-fitting business, and not by the jury on inspection. C. & E. I. R. R. Co. v. Driscoll, 176 Ill. 330, 334.

The bushing, elbow and parts of pipe were introduced merely for the purpose of enabling the jury to better understand the testimony of the witnesses and for illustration, and were so used on the trial. It is very clear that the jury could not determine from seeing the broken bushing what caused it to break. It was, as previously stated, three-sixteenths of an inch in thickness, and it was not claimed, nor was any proof introduced by appellee to the effect that it was too thin for the purpose for which it was used. The only claims made were that it was subjected to a strain by the manner in which its connections were made with the riser and the house pipe, which, as we have shown, was not proved by the plaintiff and was disproved by the defendant's evidence, and that the one and one-fourth inch pipe was not sufficiently supported, which plaintiff failed to prove.

In the examination of two physicians called by the plaintiff, they were asked whether certain serious conditions which they said they had found in the plaintiff, might be produced by asphyxiation, and one of them answered " Yes," and the other, " It might." We are of opinion that the question was erroneous. The error might, perhaps, have been cured had the witnesses subsequently testified that, in their opinion, the asphyxia caused the described conditions, but this they did not. On the contrary, they admitted, on cross-examination, that some of the most serious of the described conditions may have been the result of causes other than asphyxia, thus leaving the jury to guess whether the conditions were, or not, caused by asphyxia. The hypothetical questions put to the physicians did not call for their opinion [as to whether the asphyxiation caused the conditions described, but whether it might have caused them; and they expressed no opinion as to whether it did or not cause them. Physicians are called, in such case as the present, for the very purpose of enlight-

ening the jury as to whether the physical conditions claimed to have resulted from the injury did, or not, result from it, and when they express no opinion on that question, they furnish no basis for the assessment of damages. The proper mode of examination is to state hypothetically the facts which the evidence tends to prove, and call for the physician's opinion, on the facts stated, as to what caused the conditions described in the hypothetical question, not what might have caused them. 2 Jones on Evidence, Sec. 372, 380.

It is the opinion of the physician on the question at issue between the parties which is material (12 Am. & Eng. Ency. of Law, 2d Ed., p. 444-445); his opinion on what was, not what might have been.

The judgment will be reversed and the cause remanded.