LEWIS et al. v. DAVIS, Director General of Railroads.

No. 3641. Decided November 15, 1921. (201 Pac. 861.)

1. APPEAL AND ERROR—NO COMPLAINT THAT ANSWER WAS NOT STRICKEN WHERE QUESTION NOT OBJECTED TO. In an action for the death of a railroad machinist from an explosion of gas, assuming that a question whether carbide generators ever leaked gas was asked for the purpose of proving defendant's negligence, and that the answer in the affirmative was prejudicial, irrelevant, and immaterial, defendant could not complain of the court's refusal to strike out the answer, where no objection was made to the question before it was answered, as it showed on its face that it was irrelevant and immaterial.[1]

2. MASTER AND SERVANT—FACT OF EXPLOSION HELD TO SHOW GAS GENERATOR WAS GENERATING GAS. In an action for the death of a railroad machinist from an explosion of gas, the fact that the explosion actually occurred *held* to show that an acetylene generator on the engine on which he was working was in work-

---

[1] *Spiking v. Consolidated Ry. & Power Co.*, 33 Utah, 313, 93 Pac. 838; *Lockhead v. Jensen*, 42 Utah, 99, 129 Pac. 347.

ing order with all its parts in place, and generating gas at the moment of the explosion, where there were no eyewitnesses.[2]

3. MASTER AND SERVANT—LEAVING GAS GENERATOR IN WORKING OR-DER WHILE MACHINIST WAS REPAIRING ENGINE HELD FAILURE TO FURNSII SAFE PLACE. Where it was the custom of railroad machinists to use a lighted torch while repairing engines, and acetylene generators sometimes leaked gas, and gas might also escape through the inadvertent disconnection of a hose, and an explosion was inevitable if the lighted torch came in contact with the gas, the employer, in leaving a generator in working order while a machinist was repairing the engine, violated his duty to furnish the machinist a safe place to work.

4. MASTER AND SERVANT—IN ABSENCE OF DIRECT EVIDFNCE, DE-CEASED EMPLOYÉ PRESUMED TO EXERCISE ORDINARY CARE. In an action for the death of a railroad machinist from an explosion of gas, there being no direct evidence bearing on the question, it is presumed that he exercised reasonable care, and the burden is on the defendant to overcome the presumption.

5. MASTER AND SERVANT—RISK OF UNSAFE PLACE NOT ASSUMED UN-LESS DANGER IS OBVIOUS. If an employer was guilty of negligence in not providing an employé a safe place in which to do the work it required him to do, the employé did not assume the risk, unless the danger was so manifest, open, and obvious that a reasonably prudent man in the exercise of ordinary care should have refused to do the work.

6. MASTER AND SERVANT—EMPLOYER HELD LIABLE FOR DEATH FROM EXPLOSION, THOUGII EMPLOYÉ PERMITTED GAS TO ESCAPE BY DIS-CONNECTING HOSE. Where a railroad machinist, using a lighted torch while repairing an engine, had no reason to believe that an acetylene gas generator on the engine was in operation, the employer was liable for his death from an explosion, though he, inadvertently or otherwise, disconnected a hose, permitting gas to escape, where he did not purposely disconnect it.

7. APPEAL AND ERROR—INSTRUCTION HYPOTHESIZING TAKING OF PRE-CAUTIONS IN DEFENDANT'S SHOP AND OTHER SHOPS HELD NOT TO HARM DEFENDANT. Though an employer sued for the death of an employé should not be bound by the practice or custom of other shops, an instruction, authorizing a verdict for plaintiff if the jury found that certain precautions against the explosion of gas were usual and customary in defendant's shop and in

[2] Distinguishing *Fritz v. Electric Light Co.*, 18 Utah, 493, 56 Pac. 90; *Tremelling v. Southern Pac. Co.*, 51 Utah, 189, 170 Pac. 80.

shops doing similar work, merely imposed an additional burden on plaintiff, and did not prejudice defendant.

8.   TRIAL—INSTRUCTION AS TO PRECAUTION BY EMPLOYER AGAINST EXPLOSION OF GAS HELD NOT TO INVADE JURY'S PROVINCE. In an action for death of a railroad machinist, an instruction that if the jury believed that it was usual and customary to take certain precautions against explosions of gas, and further believed that such precautions were necessary in the exercise of ordinary care, and that a reasonably prudent person under like conditions would, in the exercise of reasonable care, have exercised such precautions, then it was defendant's duty to use reasonable care to take the precautions specified, and such precautions as a reasonably prudent person would take, etc., did not invade the province of the jury, as it was left to the jury to determine whether the precautions referred to were necessary in the exercise of ordinary care.[3]

Appeal from District Court, Third District, Salt Lake County; *J. Louis Brown,* Judge.

Action by Edward Lewis and others against James C. Davis, Director General of Railroads, United States Railroad Administration, operating the Oregon Short Line Railroad. From a judgment for plaintiffs, defendant appeals.

AFFIRMED.

*Geo. H. Smith, J. V. Lyle* and *R. B. Porter,* all of Salt Lake City, for appellant.

*Marioneaux & Beck* and *Willard Hanson,* all of Salt Lake City, for respondents.

THURMAN, J.

This is an action by the heirs of Robert Lewis, deceased, to recover damages for his death alleged to have been caused

[3] Distinguishing *Smith v. Cummings,* 39 Utah, 306, 117 Pac. 38, Ann. Cas. 1913E, 129; *Ryan v. Union Pac. R. Co.,* 46 Utah, 530, 151 Pac. 71.

by the negligent operation of the defendant's railroad. It is alleged in the complaint that the Oregon Short Line Railroad extends from Salt Lake City, Utah, through the state of Idaho into the state of Montana, upon which railroad engines and cars are operated for the purpose of carrying passengers and freight; that the Oregon Short Line Railroad Company on April 26, 1919, in connection with its business as a common carrier, had and maintained a certain roundhouse in Salt Lake City, into which defendant moved its engines in interstate commerce from time to time for the purpose of making repairs thereon; that on said last-named date the railroad company owned and had in its possession a certain engine equipped with an acetylene gas generator for generating gas; that on said date, it being necessary that certain repairs should be made on said engine, said defendant caused the same to be moved upon the pit in said roundhouse, as was customary when it became necessary for defendant's mechanics to make such repairs; that said mechanics had no duties to perform around or upon said engine, except to repair the same when directed to do so, after the same had been placed upon the pit by other employés of the defendant company. The complaint further alleges that on said 26th day of April, 1919, after said engine had been placed upon the pit in said roundhouse, the said Robert Lewis, who was then and there employed by the defendant as a mechanic, was ordered by defendant's foreman in charge of said roundhouse, and intrusted with authority to direct mechanics in and about their work, to go in and upon said engine to make certain repairs thereon; that pursuant to said command the said Robert Lewis went in and upon said engine and about the same, carrying with him a lighted torch, as was customary and usual. The complaint then in substance alleges that defendant had carelessly and negligently placed in said acetylene gas generator a quantity of carbide and water, whereby acetylene gas was being generated, and carelessly and negligently neglected to remove the float and lid from said generator, and carelessly and negligently allowed the said generator to leak gas, and when the said Robert Lewis

approached the said engine and came near enough to the same a certain quantity of said gas came in contact with his said torch, resulting in a great explosion, whereby the said Robert Lewis was so badly injured that he then and there died. The remaining allegations of the complaint relate to the earning capacity of the deceased, his relationship to the plaintiffs as husband and father, and to the damages sought to be recovered. The defendant, answering the complaint, denied every allegation charging liability, and for affirmative defenses alleged assumption of risk and contributory negligence. The case was tried to a jury, verdict was rendered for plaintiffs, and judgment entered accordingly.

Defendant appeals and relies on three alleged errors to reverse the judgment: (1) Admission of evidence over defendant's objection; (2) refusal of the court to direct a verdict for defendant; and (3) erroneous instructions to the jury.

There is no substantial dispute concerning the facts. The evidence shows that the locomotive engine in question was equipped with an acetylene gas generator as alleged in the complaint. For a detailed description of said equipment we here insert an excerpt from the testimony of John L. Porter, an employé of defendant, sworn as a witness for plaintiffs. After stating that he was a machinest acquainted with acetylene gas generators, and that Robert Lewis had been assigned to repair an injector and bell ringer on the engine, the witness said:

"The left injector is on the left side of the cab of a locomotive, and is used for putting water into a locomotive boiler. The bell ringer is on top of the locomotive. The receptacle that is used to generate gas is located about the center of the running board on the left side of the locomotive. The running board extends from the front to the back all the way on either side of the locomotive. The running board is about 4 feet from the rails, and the acetylene tank is bolted onto the running board. The outside casing of the acetylene tank is about 24 inches and is about 12 inches in diameter. To generate gas you have to have carbide. The carbide is placed in the bottom under the water, and is about 6 or 8 inches from the bottom. There is an outside casing; then in that casing there is a receptacle with a grate on it which fits in down to the bottom.

On top of the grate is the carbide. And above the carbide is the water, and below is a spigot for the used water to be drawn off. To get the acetylene generator ready to produce gas after the tank is cleaned out, the receptacle containing the carbide is placed on the grate, and then the water can is put in. The water then drips onto the carbide, and gas is produced. The flow of water is regulated by pressure from the top. The pressure that regulates the flow of water is called a float or gas clock. The tank is covered over with what is called a lid or cover. The cover can be detached from the float. The float is something similar to an inverted jar. It is hollow and is made of tin. On the top of the float is a piece of brass that is used as a hose connection. This brass has a hole in it for gas to pass through, and is threaded. The float is about 18 inches long and about 10 inches in diameter. The float fits in between an inside and an outside wall. The float moves up and down as the gas generates. There is a cotter key that holds the float in place, and before any gas can be generated the cotter key must be removed, and when the cotter key is removed it is ready to generate gas. The float regulates the flow of water onto the carbide. The gas is generated by the water dripping on the carbide. The gas goes out through the tube in the top of the float. Engine 4709 had this kind of an arrangement for generating gas in April, 1919. This kind of gas is explosive if a flame comes in contact with it."

There was no eyewitness to the accident which resulted in the death of Robert Lewis. His helper or assistant, George Millerberg, testified that he was working with the deceased the night he was killed; that they went up onto the engine through the cab, then onto the running board, where they examined the injector. Witness stood inside the cab, holding the torch while Lewis stepped outside and looked at the injector. Lewis then sent witness to the air room, about 300 feet away, for another injector. Witness was gone about four minutes. When he returned he found Lewis lying on the floor about 3 feet from the engine, and parallel with it, his head toward the front. Lewis was breathing very heavily, and not moving a muscle. Witness noticed a cut below the eye and along the cheek bone. He and Lewis had only one torch between them, and Lewis was using it. Other evidence showed that the skull was fractured, and that there was an opening into the brain. A physician testified that such an injury could not have been caused by a fall from the running board.

There is no question under the evidence but that the injury
was caused by a gas explosion. Several employés working in
the roundhouse in the near vicinity heard a crash and felt the
shock. The cover or float was found sticking in the roof above
the engine. The nipple on the end of the float was sticking
in the plank. It was driven into the wood its entire length,
which was 2½ or 3 inches. Neither water nor carbide was
found in the tank after the accident, and the water can was
missing.

There was considerable testimony as to what the custom or
practice was to prevent an explosion when an engine was
placed for repairs. There was evidence to the effect that in
April, 1919, the practice in the roundhouse was to disconnect
the hose, take the float and water can out, put the can on the
running board and the float between the hand rail and the
boiler, open the bottom cock, and draw the water and surplus
carbide out. Then after a few minutes there would be no
danger of an explosion.

The evidence is quite conclusive that the machinist who
was directed to make repairs on the engine had no duty to
perform in connection with putting the generator in a safe
condition. This duty was performed by other employés to
whom the duty was assigned. The evidence tends to show
that if these precautions are not taken and a lighted torch
comes in contact with the gas an explosion is inevitable. The
evidence also tends to show that there is no danger unless the
generator leaks gas or the hose becomes disconnected allowing
the gas to escape.

Taking the evidence as a whole, there seems to be no escape
from the conclusion that an explosion actually took place, and
that it was caused either by the generator leaking gas or by
the hose becoming disconnected. Either condition would ac-
count for the explosion, for it is not disputed that Mr. Lewis
was working with a lighted torch.

The defendant earnestly contends that there is no evidence
whatever that the generator was leaking gas, and that if the
hose became disconnected it must have been disconnected by
Mr. Lewis himself, either accidentally or otherwise, in which

event the defendant would not be liable.  This contention of defendant is vigorously contested.  Plaintiffs contend with much earnestness and considerable force that the proximate cause of the injury was placing and leaving the carbide and water in the generator, and neglecting to remove the float therefrom before the engine was set out for repairs.  These contentions of the respective parties will receive further consideration before concluding this opinion.

During the course of the trial one of plaintiffs' witnesses, after stating that he had seen carbide generators in operation, was asked by plaintiffs' counsel if they ever leaked gas. The witness answered: "Yes; they do."  Counsel for defendant moved that the answer be stricken on the ground that it was immaterial and irrelevant.  The court assumed that the question was preliminary, whereupon plaintiffs' counsel said:

"No;  It is not preliminary.  *  *  *  If we can show that such tanks do actually leak, then it is evidence to go to the jury."

The gist of defendant's contention is that plaintiffs were seeking to establish defendant's negligence by showing that an equipment similar to the one in question sometimes failed to properly function.  As stating defendant's position, we quote the following from its brief:

"The law, we believe, is well settled that one cannot show an act or acts of negligence at other times or places, in order to prove a person guilty of a specific act of negligence.  This doctrine is supported by many cases."

Counsel then cite the following:  *Lockhead* v. *Jensen*, 42 Utah, 99, 129 Pac. 347; *People's Gas Co.* v. *Porter*, 102 Ill. App. 461; *International & G. N. R. R.* v. *Ives*, 31 Tex. Civ. App. 272, 71 S. W. 772; *Clark* v. *Smith*, 72 Vt. 138, 47 Atl. 391; *C. B. & Q. R. R.* v. *Lee*, 60 Ill. 501; *Robinson* v. *F. & W. R.*, 7 Gray (Mass.) 92; *Christensen* v. *Union Trunk Line*, 6 Wash. 75, 32 Pac. 1018; *Dalton* v. *C., R. I. & P. Ry. Co.,* 114 Iowa, 257, 86 N. W. 272; *Delaware, etc., R.* v. *Converse*, 139 U. S. 469, 11 Sup. Ct. 569, 35 L. Ed. 213.

There can be no doubt as to the correctness of the rule stated by defendant in the excerpt above quoted.  There is, however, some question as to the application of the rule to

the question presented here.   Counsel for plaintiffs, replying
to defendant's contention, state their position as follows:

"Counsel for defendant mistake the reason on which it was ad-
mitted, and contend that it shows other acts of negligence at other
times and places.   That is not the proposition involved.   It was
not a question of negligence that the type of generator leaked, but
was a question of construction of the type of generator in question,
and whether that type as ordinarily constructed usually leaked, and,
since that type usually leaked, the one in question being similarly
constructed, would do the same thing."

As illustrating this view the following authorities are
cited:  1 Wigmore, §§ 451 to 458; *Brierly* v. *Davol Mills,*
128 Mass. 291; *Flaherty* v. *Powers,* 167 Mass. 61, 44 N. E.
1074; *Findlay Brewing Co.* v. *Bauer,* 50 Ohio St. 560, 35
N. E. 55; *Blackman* v. *Collier,* 65 Ala. 312; *Davis* v. *Sweeney,*
80 Iowa, 391, 45 N. W. 1040; *Kramer* v. *Messner,* 101 Iowa,
88, 69 N. W. 1142; *Avery* v. *Burrall,* 118 Mich. 672, 77 N. W.
272; *People* v. *Thompson,* 122 Mich. 411, 81 N. W. 344; *Car-
penter* v. *Corinth,* 58 Vt. 216, 2 Atl. 170.

Without commenting upon the cases cited by either plain-
tiffs or defendant with the view of determining their applica-
tion to the instant case, we feel warranted in expressing seri-
ous doubt as to whether the answer of the witness which de-
fendant sought to have stricken had any bearing whatever
upon the question of defendant's negligence.   The form of
the question which elicited the answer does not conclusively
indicate an attempt to prove negligence by showing that the
generator leaked gas, but rather as showing the habit of that
particular type of instrumentality.

In any event, as we view the case, assuming that the ques-
tion was asked for the purpose of proving defendant's neg-
ligence, and that the answer was prejudicial, irrelevant, and
immaterial, still defendant has no just grounds of complaint,
for the reason that no objection was seasonably made.   If
defendant's contention is correct, the question on its face
showed that it was irrelevant and immaterial as to the de-
fendant's negligence.   This being the case, it was the duty
of defendant to object to the question itself, and not
wait until an unfavorable answer was given, and then          1

move to strike it out. This court has heretofore passed upon this identical question, and placed itself in harmony with the courts in many other jurisdictions of the country. In *Spiking* v. *Consolidated Ry. & Power Co.*, 33 Utah, 313, 93 Pac. 838, cited by respondent, an action prosecuted for a death caused by negligence on a street crossing, plaintiff's counsel, without objection, asked a witness the following question concerning the deceased: "How was Mr. Spiking as to being a careful and cautious man?" The witness answered: "Yes, sir, he was very careful." After the answer was made counsel for appellant immediately moved to strike it out as irrelevant, immaterial and incompetent. The court denied the motion, and permitted the answer to stand. The question was brought to this court for review. The ruling of the trial court denying the motion to strike was sustained. The reasons given for the rule are found on pages 328 and 329 of the Utah report (93 Pac. 838), and appear to be more than ordinarily logical and convincing. We see no reason in the instant case why there should be a departure from the rule.

At the close of plaintiffs' evidence defendant moved for a nonsuit, and when all of the evidence was submitted moved for a directed verdict. Both motions were denied. Defendant excepted to both rulings of the court and argues the exceptions together. The grounds assigned for the motion are: (1) Failure to prove defendant's negligence at all; (2) failure to show that defendant permitted gas to leak; (3) the evidence shows that deceased was guilty of contributory negligence; (4) the injury, if caused by failure to properly care for the generator, was due to the negligence of fellow servants; (5) the evidence fails to show the proximate cause of the injury; (6) the deceased assumed the risk. The gist of defendant's contention in support of this assignment seems to be that there is no definite proof of any specific act or omission on the part of defendant constituting negligence which was the proximate cause of the injury.

It is true that no one saw the accident happen. No one know just what Mr. Lewis was doing when the explosion

occurred. No one testified that the generator leaked gas, or that the hose was disconnected, thereby permitting gas to escape. No one saw water and carbide in the tank, or noticed the condition of the float. No one saw the generator so as to see whether it had been taken apart, or whether the parts were in place, each performing its function in the generation of gas. No one knows the immediate cause of the explosion, or just how Mr. Lewis came to his death.

The above propositions, in substance, constitute the basis upon which defendant relies in support of the contention that the court erred in denying its motion for nonsuit and directed verdict.

In the opinion of the court, under the evidence in the record, the fact that an explosion actually occurred is an answer to practically every proposition above set forth. If there had been no water and no carbide in the generator under pressure by means of a float on top and no gas leaking or hose disconnected by which gas could escape and no contact between the gas and a lighted torch or other fire there could have been no explosion, and if there had been no explosion Robert Lewis would not have been killed in the manner shown by the evidence. Because there was an explosion it follows as a necessary corollary that the acetylene generator was in working order, with all its parts in place, generating gas at the very moment of the explosion, and the only questions remaining, as far as the motion for a directed verdict is concerned are: (1) Whether or not directing the deceased, Robert Lewis, to work in and about the engine with the generator in that condition constitutes actionable negligence, or, in other words, was it a safe place in which to work; (2) was deceased guilty of contributory negligence? (3) did he assume the risk?

These questions can be answered without circumlocution or extended comment. The custom of the machinists in performing their work was to use a lighted torch. It is stated in the evidence that the generator when in operation sometimes leaked gas. It was also stated that the machinist might inadvertently disconnect the hose by which gas would

be permitted to escape. If the lighted torch came in        3
contact with the gas an explosion would be inevitable.
Manifestly, when the generator was generating gas the place
was unsafe in which to work with a lighted torch.

Was deceased guilty of contributory negligence? There
being no direct evidence bearing upon the question, it is
presumed he exercised reasonable care. The burden was
upon the defendant to overcome this presumption. It failed
to discharge the burden. Did the deceased assume the risk?
If defendant was guilty of negligence in not providing the
deceased a safe place in which to do the work it required
him to do, deceased did not assume the risk, unless the dan-
ger was so manifest, open, and obvious that a reasonably
prudent man in the exercise of ordinary care would have
refused to do the work. We find no evidence whatever that
the danger was open or obvious. Under the evidence the
deceased had no reason to believe defendant would direct
him to work on the engine while the generator was in oper-
ation. It is, however, contended by defendant that if de-
ceased inadvertently or otherwise disconnected the hose so as
to permit gas to escape, it would not be liable. We
cannot agree with this contention. We are of the        4, 6
opinion, under the facts of this case, that the jury
were warranted in finding that leaving water and carbide in
the generator, without removing the float, was the proximate
cause of the injury. If this be true, no matter how the gas
came to escape, the defendant would be liable unless the
deceased purposely disconnected the hose, which, under the
evidence, is inconceivable.

Defendant in support of its motion for a directed verdict
calls our attention to the following cases, none of which are
in point for reasons heretofore stated: *Titus* v. *Railway Co.*,
136 Pa. 618, 20 Atl. 517, 20 Am. St. Rep. 944; *Fritz* v. *Elec.
Light Co.*, 18 Utah, 493, 56 Pac. 90; *Patton* v. *Texas & Pac.
Ry. Co.*, 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361;
*Tremelling* v. *So. Pac. Co.*, 51 Utah, 189, 170 Pac. 80; *Strother*
v. *C., B. & Q. R. R. Co.* (Mo.), 188 S. W. 1102; *Murray* v.
*Pittsburg, C., C. & St. L. R. Co.*, 263 Pa. 398, 107 Atl. 21,

. The court committed no error in denying defendant's motion for a nonsuit and directed verdict.

Defendant assigns as error the court's instruction No. 8, which reads as follows:

"You are instructed that if you believe from a preponderance of the evidence that it was usual and customary in the shop in which the deceased, Robert Lewis, was employed, and in shops doing similar work, to remove the float from the acetylene tank, and to likewise remove the carbide and water so that gas would not be generated in the acetylene tank before machinists such as the deceased were required to work in, around, and about the same, and further believe from a preponderance of the evidence that such precautions were necessary in the exercise of ordinary care, and that a reasonably prudent person under like conditions would in the exercise of reasonable care have exercised such precautions, then you are instructed that it was the duty of the railroad company to use reasonable care to remove the float from the acetylene tank and to remove the carbide and water and take such precautions as a reasonably prudent person in the same line of work would take to prevent gas from being generated in said tank; and, if you find that the defendant failed to take such precautions and as a result thereof an explosion occurred, and that by reason of the explosion the deceased met with his death, then you are instructed that the railroad company would be negligent."

This instruction is assailed on two grounds: (1) What was usually or customarily done around other shops is immaterial; (2) the trial court told the jury, as matter of law, that certain facts constituted negligence, and thereby invaded the province of the jury.

It is undoubtedly true that the defendant should not be bound by the practice or custom of other shops, and if that had been the only test submitted by the instruction there might be some ground for defendant's objection. But the instruction reads:

"If you believe from a preponderance of the evidence that it was usual and customary *in the shop in which the deceased, Robert Lewis, was employed*, and in shops doing similar work," etc. (Italics ours.)

It thus appears that the court imposed upon the jury the duty of finding that other shops, as well as that of defendant, adopted a certain custom in doing their work, thereby rendering the plaintiff's chances to obtain a favorable        7

verdict more precarious than it would have been if the proof had been limited to the custom in defendant's shop. Defendant certainly was not prejudiced as far as that feature of the instruction was concerned.

It is contended, however, that the jury were instructed that certain facts constituted negligence, and that the court thereby invaded the province of the jury. In support of this contention many cases are cited: *Smith* v. *Cummings*, 39 Utah, 306, 117 Pac. 38, Ann. Cas. 1913E, 129; *Ryan* v. *U. P. R. R. Co.*, 46 Utah, 530; *Ill. Cent. R. Co.* v. *Griffin*, 184 Ill. 9, 56 N. E. 337; *Memphis St. Ry. Co.* v. *Haynes*, 112 Tenn. 712, 81 S. W. 374; *St. Louis & S. W. Ry. Co.* v. *Gill* (Tex. Civ. App.) 55 S. W. 386; *C., B. & Q. R. R. Co.* v. *Krayenbuhl*, 65 Neb. 889, 91 N. W. 880, 59 L. R. A. 920.

In *Smith* v. *Cummins*, *supra*, the trial court assumed to instruct the jury that certain facts, if established, constituted prima facie ownership in the plaintiff. This court held that the instruction was prejudicial error. If as matter of law the facts stated had constituted prima facie ownership in the plaintiff, this court would not have reversed the judgment. That, in our opinion, is the controlling distinction between that case and the case at bar.

In *Ryan* v. *Railroad*, *supra*, the trial court assumed to instruct the jury concerning the weight that should be given to certain facts. This court reversed the judgment. These cases are clearly distinguished from the instant case. So are the cases cited by defendant from other jurisdictions.

A close analysis of the instruction to which objection is made discloses the fact that only such conduct or omissions of defendant are said to constitute negligence as should be declared negligent as matter of law. The jury were told in substance that if they believed from a preponderance of the evidence that it was the custom in defendant's shop, and other shops engaged in similar work, to use certain precautions (specifically naming them), and "further believed from a preponderance of the evidence *that such precautions were necessary in the exercise of ordinary care, and that a reasonably prudent person under like conditions would in the exer-*

*cise of reasonable care, have exercised such precautions,"*
then it was the duty of the defendant to adopt such pre-
cautions, and if it did not do so, and an explosion occurred
resulting in death, the defendant company would be negli-
gent (Italics ours.)

It is quite manifest from the analysis we have made that
the court did not *unqualifiedly* instruct the jury that
certain conduct or omissions of defendant would con- 8
stitute negligence. *The jury were given the right to
determine whether the precautions referred to were necessary
in the exercise of ordinary care.* If the jury found they were
necessary, then they were instructed that the failure of the
defendant to adopt such precautions would constitute neg-
ligence. The language in italics so qualifies the entire in-
struction as to leave to the jury the determination of every
fact and the weight that should be given to it in arriving at
their verdict.

We find no error in the record. The judgment of the trial
court is affirmed, with costs.

CORFMAN, C. J., and WEBER, GIDEON, and FRICK,
JJ., concur.