### STATE v. THOMPSON.

No. 6895. Decided June 5, 1946. (170 P. 2d 153.)

114

See 40 C. J. S., Homicide, sec. 33; 26 Am. Jur., 528.

*Ray S. McCarty,* of Salt Lake City, for appellant.

*Grover A. Giles,* Atty. Gen., *Herbert F. Smart,* Asst. Atty. Gen., and *Brigham E. Roberts,* Dist. Atty., of Salt Lake City, for respondent.

WADE, Justice.

The defendant, Phillip Thompson, was convicted of murder in the first degree, with a recommendation of leniency, and sentenced to life imprisonment. He brings this appeal from that judgment.

All of the people involved in the incident at the time of the killing were colored. Late in the evening of March 17, 1945, or early in the morning of the next day, the defendant having been drinking, went to the home of Mr. and Mrs. Perkins, in the basement of which Frank Brown, the deceased, operated a dice game. Defendant joined in the game and lost most of his ready cash, amounting to about $100. Thereupon he claimed the game was crooked and after some argument thereon with Brown, defendant went home where he armed himself with a loaded automatic pistol and returned to the place where this game was in progress. When he returned there was no vacant place at the table where the dice game was being played, whereupon defendant gave a

boy at the table 50¢ for his place, and then stepped back from the table and drew his gun and said: "Put your money on the table and get away from it." No one seemed to realize that he had drawn a gun and his order was not obeyed whereupon defendant commenced to shoot. Altogether he fired eight shots. The first shot was either fired into the floor or over the people's heads. Later he turned his gun directly on Brown and shot him at least twice. Brown staggered into an adjoining room, fell to the floor and died before he reached the hospital. At least two other people were wounded and bullets went through the clothing of others. At one time he shot into a crowd of persons who were rushing to a door to get out of the room, wounding one person in the neck. Later he apparently was shooting directly at two men named Fowler and Hervey; they ducked under his shots and then rushed him and took the gun away from him. The last shot was fired after Fowler had grabbed the gun. And after it was over with there was still one loaded cartridge in the gun.

Defendant in his testimony admitted that he left the game and went to his home which was a block and a half away and procured the gun which he knew was loaded, and returned to the game intending to use it if necessary to scare Brown into giving back the money he had lost. He testified that when he returned to the game with the gun he first went to Brown, who was on a stool at the table "making his take," that is, taking 5 cents from the bets as they were placed, and asked Brown to give back his money which Brown refused to do; that he then went to a man named Hervey who was across the table from Brown returning the dice, and tried to ask him to persuade Brown to give him his money back, but that Hervey said: "Can't you see I'm busy." That he thereupon procured the place at the table and then again asked Brown to return his money which Brown again refused to do, and thereupon he stepped back from the table and drew his gun; that he did not know that the safety on the gun was not "on," and was surprised when the gun fired; that he knew that this shot was wild and he

did not remember firing any other shots but did remember that some one grabbed the gun from his hand and in taking it from him another shot was fired. He then left the place and claims that he did not know until the next day that he had hurt any one.

The case was submitted to the jury on two theories of murder in the first degree: 1. That the killing "was intentional, deliberate and premeditated and done with malice afore thought." 2. That the killing "was perpetrated by an act greatly dangerous to the lives of others, ■ evidencing a depraved mind regardless of human life." After the evidence was in the defendant moved the court to require the state to elect on which one of these theories of murder in the first degree it would stand, and assigns as error the court's refusal to grant that motion. Counsel, however, does not argue that it was error to submit both of these theories to the jury, but contends that under the instructions given the jury was authorized to find the defendant guilty of murder in the first degree, if all jurors were satisfied that he was guilty thereof, even though some of them believed him guilty only under one theory and others believed him guilty only under the other theory. To the effect that such instruction would be erroneous he quotes from *State* v. *Roedl*, 107 Utah 538, 155 P. 2d 741, 747, where referring to *State* v. *Rasmussen*, 92 Utah 357, 68 P. 2d 176, we said:

> "While we held in that case in a prosecution for involuntary manslaughter wherein several unlawful acts, such as driving at an unlawful rate of speed, driving without a proper lookout, and others, were alleged to have been committed resulting in death, the jury must unanimously agree on one or more of the specified unlawful acts and they may not combine their conclusions on different specified acts so as to converge on an ultimate verdict of guilty."

There is doubt that the Rasmussen case really holds what we in the Roedl case said it did. In the opinion first appearing in the Rasmussen case, written by Mr. Justice Moffat and concurred in by Mr. Justice Ephraim Hanson, it was

stated as their opinion that the jury must agree unanimously on one or more of the specified unlawful acts, and that the judgment of the trial court should be reversed on that account but that was not the opinion of a majority of the court. Each of the other three Justices wrote a separate opinion but none of such separate opinions definitely holds that all of the jurors must unanimously agree on one or more of the specified unlawful acts but simply hold, without deciding that question, that even if that is the law the jury was sufficiently instructed to that effect in that case. Nor was that question determined in the Roedl case. There we held that regardless of what the law is on that question no prejudicial error was committed because the evidence was so conclusive on the question of a deliberate and premeditated killing that the jury could not have been misled thereby.

It is also not necessary for us to decide that question and we therefore do not decide it here. Counsel, to sustain his contention that the court authorized the jury to find the defendant guilty of murder in the first degree, even though some found him guilty only under one theory and others found him guilty only under the other theory, relies on the following instruction:

"Before you may find the defendant guilty of murder in the first degree, all of the jurors must concur as to either one or the other of the kinds of murder above referred to * * *."

That statement says in effect that before the jury is authorized to find the defendant guilty of murder in the first degree all of the jurors must concur in finding him guilty under one theory or all of them must concur in finding him guilty under the other theory. Almost the exact words used in this instruction are used with that meaning in some of the opinions in the Rasmussen case. It is clear that this is the correct construction when we consider the fact that the court is cautioning the jury that: *Before* they may find the defendant guilty of murder in the first degree

*"all of the jurors must concur as to either one or the other of the kinds of murder above referred to."*

On the other hand, a different meaning would have been indicated had the court said: That all that is necessary in order to find the defendant guilty of murder in the first degree is that

*"all of the jurors must concur as to either one or the other of the kinds of murder above referred to."*

The italicized portions of the above sentences, as indicated, are directly quoted from the instruction, and are the same in both sentences but by the change in the previous context and a change in the emphasis placed on the words, a different meaning is obtained. The fact that the court is cautioning the jury, that in determining its verdict, it must observe the limitations therein stated, rather than suggesting that such limitations are unimportant clearly indicates an intention to limit the jury in finding the defendant guilty of murder in the first degree to a situation where all the jurors unanimously concurred in such finding on the same theory of such murder. Thus the instructions of the court were in accord with what the defendant contends they should have been.

Defendant next contends that the evidence is insufficient to sustain a verdict of murder in the first degree on either theory thereof and is also insufficient to sustain a verdict of murder in the second degree, but that the case should have been submitted only on the question of ■ voluntary manslaughter. In *State* v. *Russell*, 106 Utah 116, 145 P. 2d 1003, 1008, we divided murder in the first degree into four separate categories. The first of those categories is the same as the first theory of such murder herein and was therein defined in the language of the statute, Section 103-28-3, U. C. A. 1943, as follows:

"1. Every murder perpetrated by poison, lying in wait or any other kind of willful, deliberate, malicious and premeditated killing is murder in the first degree."

From the evidence in this case could a reasonable mind be convinced or persuaded beyond a reasonable doubt that this was a wilful, deliberate, malicious and premeditated killing? In *State* v. *Russell,* supra, we, in substance, held that in order to constitute murder in the first degree under this category, the defendant must have killed the deceased after and pursuant to a definitely formed intention to so kill him, which intention had been previously formed, designed and thought out beforehand after a cool and careful consideration and weighing of the question of whether or not to so kill the deceased. In the Russell case we did not emphasize the requirement that there must be a cool and careful consideration of the intention to kill. However, we did point out that:

"some courts make a slight distinction between those terms (*premeditation* and *aforethought*) and the term *deliberation,* holding that it requires more calmness of mind and coolness of blood for deliberation than merely to premeditate and think out beforehand * * *."

We also held:

"If defendant's mind was incapable of deliberately and premeditatedly forming a specific intention or design to kill, he could not commit murder in the first degree under this division, but he still might have the mental capacity to"

commit murder in the second degree. If murder in the first degree under this category requires a more cool consideration in forming the required plan, design and intention than does murder in the second degree, then it can be readily understood why the mind might be incapable of giving the required cool and calm consideration required for murder in the first degree under this category and still be capable of forming the necessary plan, design and intention to commit murder in the second degree. The fact that the term *deliberation* is used in defining murder in the first degree, and the fact that four terms are repeated one after the other with similar meaning indicates an intention to emphasize that there must be a cool, careful consideration of the plans

before murder in the first degree under this category can be committed. We also held that there is no definitely fixed length of time required to ponder or consider such question but there must be sufficient time under the circumstances of the case so that the defendant can formulate such plan, design and intention and coolly weigh and consider the same.

Thus, if the mind of the accused was incapable of formulating or thinking out beforehand a definite plan, design or intention to kill the deceased or of a cool consideration thereof, he was not guilty, under this category, of murder in the first degree. This is true whether ■■ such incapacity was the result of intoxication, excitement, emotional upset or some other cause which produced that result. Of course, a person may be excited, intoxicated and emotionally upset, and still have the capacity to formulate the necessary plan, design or intention to commit murder in the first degree. Also a person might have the capacity to formulate the necessary intention and still not be guilty of having formulated such intention. However, the court cannot take the question from the jury unless the evidence is such that all reasonable minds must agree that the jury could not reasonably be convinced therefrom beyond a reasonable doubt of the defendant's guilt.

It is urged that the defendant was drunk and while in that condition he had lost his money in a gambling game in which he believed there had been cheating, from which a violent quarrel had resulted between defendant and Brown. That as a result thereof at the time of ■■ the killing he was so intoxicated, excited, angry and emotionally upset that he did not have the ability to formulate the necessary plan, design and intention to kill or to coolly consider or weigh the same, or if he did have such capacity, under the evidence it was so highly improbable that he did formulate such design and intention or to coolly consider or weight the same that this court should say as a matter of law that he was not guilty of murder in the first degree under this category. It is further argued that had defendant formulated a definite plan or intention to kill

the deceased when he returned to the dice game, he would have simply drawn his gun and shot and killed him without first getting a seat at the table and then shooting wildly with his first shots.

The evidence of intoxication, excitement, anger and emotional upset, whether considered all together or separately, is not sufficient to justify the court in holding as a matter of law that he did not have the necessary intent, or had not with sufficient coolness planned to kill the deceased. All of his actions after he left the game the first time indicate a definite planning of his future course and also indicate an opportunity to coolly weigh and consider that course of action. He walked some distance to his home and procured a gun and immediately returned to the game. He then asked some one else to give him a place at the table and thereafter he drew his gun and ordered the players to put their money on the table, and only when his order was not obeyed did he commence to shoot. After the first wild shot or two he turned his gun directly on Brown and shot him several times. The fact that he did not shoot and kill Brown when he first returned to the place where the dice game was going on, but waited until he had procured a place at the table and then drew his gun and ordered the players to put the money on the table, indicates that he had not planned to shoot Brown without giving them that opportunity and that he may not have intended to shoot if that order was complied with. The facts as disclosed by the evidence are sufficient to justify the jury in finding that he deliberately planned his course of action substantially as it later took place. From the time that he left the dice game to the time he drew his gun and commenced shooting there was no quarrel or fight or other incident to interfere with his plans. (He walked some distance to his home and back alone to procure the gun, and during that time had the opportunity to plan, consider and weigh his future course of action.) Every move he made during that time is consistent with and indicates a planned course of action without interruption or interference from any outside source. The only possible

event during that time that could have caused him to change his plan was the fact that his order to put the money on the table was not complied with. This evidence tends to show that he had planned to give the players the opportunity to turn over to him the money so that he could recoup his previous losses in the game without shooting and in case this demand was complied with he might harm no one but in case his demand was not complied with he would commence shooting. The fact that he shot Brown two or three times, and that when he lost his money he had accused Brown of cheating, indicates that if he had to start shooting he planned to kill Brown, and maybe others. If he coolly planned and intended to kill Brown in case the money was not placed on the table in accordance with his demand then he was guilty of murder in the first degree under this category. The fact that he planned to kill Brown only in the event that his order to put the money on the table was not complied with does not make it any the less murder in the first degree. *People* v. *Thomas,* 25 Cal. 2d 880, 156 P. 2d 7. Counsel cites a number of California cases, which if applied to the facts as he construes them to be would require a reversal of this case, but which if applied to the facts as we construe them do not have that effect. The evidence was therefore sufficient to justify the jury in finding the defendant guilty of murder in the first degree under this theory.

The elements of murder in the second degree being included in murder in the first degree we need not consider further whether the court erred in submitting that question to the jury. Did the court err in submitting the question of murder in the first degree under the second theory, to the jury? In the Russell case this theory was designated category 4, and using the language of the statute, Section 103-28-3, U. C. A. 1943, was therein defined as follows:

"4. Every murder perpetrated by any act greatly dangerous to the lives of others and evidencing a depraved mind, regardless of human life, is murder in the first degree."

In that case we held that it was not necessary to have an intention to kill a specified person under that category, but there might be such intention to kill people generally, that the act, greatly dangerous to the lives of others, must be directed against people generally and indiscriminately and not against any one person in particular. We also pointed out that in each category of murder in the first degree the term "every murder" is used, and thus murder in the first degree requires all of the elements of "murder" as defined by Section 103-28-1, U. C. A. 1943, and common law. That there can be no murder without "malice aforethought" which means planned, designed and thought out beforehand. Thus under this category, in order to commit murder there must be a planned, designed and intentional doing of an act, which is greatly dangerous to the lives of others, knowing that the natural and probable consequences of such act would be to cause death or great bodily injury to some other person. Thus there can be no murder, either in the first or second degree, without a planned, designed or thought out beforehand intention to kill or cause great bodily injury, or to do an act knowing that the natural and probable consequences thereof would be to cause death or great bodily injury to some other person, or to commit certain types of felonies. Anything less does not have the necessary "malice aforethought."

So if the defendant shot and killed the deceased Brown, pursuant to a previously thought out plan, design and intention, to draw his gun and demand that the players put their money on the table so that he could recoup his loss therefrom, and in case they did not comply with his demand, to commence shooting at the people in the room indiscriminately without intending to harm any one of them in particular, provided further that in formulating and executing his plan he fully realized and knew that the natural and probable consequences of the act of shooting into the crowd would cause death or great bodily injury to one or more persons, and in so doing he evidenced a depraved mind with no regard whatever for human life,

then he was guilty of murder in the first degree under this category.

The difference between murder in the first degree in the first and fourth category is: That in the first category there must be a planned, designed and previously thought out intention to kill the person killed after a deliberate or cool weighing and consideration of such plan; whereas, in the fourth category, it is not necessary that there be a previously thought out intention to kill the person killed or any other particular person nor is there a necessity for deliberate or cool weighing of such planned course of action. But there must be a previously thought out plan, design and intentional doing of an act which is greatly dangerous to the lives of others, with the knowledge and full realization that the natural and probable consequences thereof will cause death or great bodily injury to other persons and the surrounding circumstances of such killing must be such as to evidence to the jury a depraved mind with no regard whatever for human life.

The only elements required under this category which has not already been disposed of in considering the first category is whether the evidence will justify a finding that the act which the defendant did was greatly dangerous to the lives of others, and whether he knew when doing that act that its natural and probable consequences would be to cause death or great bodily injury, and whether the circumstances of this killing evidence a depraved mind without any regard for human life. The evidence in those respects is clearly sufficient unless it only indicated an intention to kill the deceased, rather than that it was directed at people generally. We think from the manner of firing indiscriminately at all the people in the room the evidence was sufficient to justify a submission on that question.

Defendant further urges that the court erred in instructing the jury on the necessary elements of murder in the first degree under the fourth category. On this question the court gave the following instructions:

"The elements of the second kind of murder in the first degree above referred to are as follows:

"First, that on or about March 18, 1945, in Salt Lake County, State of Utah, the defendant, Philip Thompson, fired a shot or shots with a pistol and thereby killed Frank Brown; and

"Second, that the defendant when firing such pistol, knew that such act was greatly dangerous to the lives of others, and knew that the natural and probable result of his firing such pistol was to place the lives of others in jeopardy; and

"Third, that such conduct of the defendant evidenced a depraved mind, regardless of human life *in that* said conduct was of such a character as to indicate an utter lack of concern for the consequences and was clearly wanton and reckless as to the safety of others." (Emphasis ours.)

Counsel's argument seems to be that since the court uses the term "in that" which is italicized in the third paragraph of the instruction, that it used a "videlicit" which is the equivalent of saying "that is to say" and thereby qualified all of the other requirements stated in those two paragraphs and in effect told the jury that if they found that the defendant was wanton and reckless as to the safety of others they should find him guilty of murder in the first degree under this category. The statement "wanton and reckless as to the safety of others," usually indicates a high degree of negligence and is the term often used to describe involuntary manslaughter. The construction placed on these instructions by counsel is obviously not correct. In the first place, the act of firing eight shots in a crowded room of people if done intentionally could never be correctly classified as acts of mere negligence. Second, the term "in that" is in the middle of the third paragraph and it in no way qualifies what is said in the first and second paragraphs. And third, the words following that term are not a description of negligence but require an utter lack of concern for the consequences. The court in this respect did not commit error although the use of the words "wanton and reckless" are unfortunate.

There is another question on these instructions that must be considered. The defendant claimed that when he drew the gun he did not know that the safety was "off," and that

he did not intend to discharge it as he did. In other words, that the shooting was accidental and not intentional. This was the only real defense that the defendant had. Neither in this instruction nor elsewhere was the jury told that a planned and intentional shooting was a necessary element of the crime of murder in the first degree under the fourth category under the facts of this case. Nor was the jury so told in substance. The jury was instructed that a necessary element of that crime was that when defendant fired the shot he knew that it was greatly dangerous to the lives of others and that the natural and probable consequences thereof would be to place in jeopardy the lives of others. But all that could be true and still the shot could have been fired accidentally. Nor does the instruction that the act of firing the shots must evidence to the jury a depraved mind, regardless of human life amount to telling them that the shooting must be intentional and not accidental. This is particularly true in view of the court's use of the words "wanton and reckless as to the safety of others," which suggests negligence and accident rather than intentional acts. In view of the above circumstances, the failure to instruct the jury that a necessary element of murder in the first degree under the fourth category is a planned and intentional shooting was prejudicial error and the case must be reversed on that account. The probability that the jury might conclude that an intentional shooting was not necessary in order to convict the defendant of murder in the first degree under this category is emphasized by the fact that in stating the elements of murder in the first degree under category 1, and the elements of second-degree murder the court pointed out the necessary intention which the defendant must have.

By instructions 12 and 13, the jury was told that *if the defendant had a gun for the purpose of his own self-protection,* and not intending to injure Brown or others, he acidentally discharged the gun without due care and circumspection thereby killing Brown, then he would be guilty only of involuntary manslaughter. Had the

italicized provision of these instructions been omitted they would have cured the omission in the previous instructions of the element of an intentional shooting. But since both of these instructions were contingent on the jury finding that the defendant had the gun for his own protection, thus indicating that if he fired the gun without due caution and circumspection or by accident but had it for the purpose, as he testified, of scaring Brown into returning the money which he had previously lost, and not for his own protection, he would be guilty of a greater crime than involuntary manslaughter, and might infer therefrom that he was guilty under such circumstances of murder in the first degree.

The giving of this instruction, limited as it was, was clearly erroneous. There was no evidence to justify the conclusion that the defendant had the gun only for his own self-protection. He testified that he procured the gun for the purpose of scaring Brown into giving him back the money which he had previously lost, by reason of Brown's cheating in a gambling game. That is the most favorable fact to him that the evidence would justify. Defendant further urges that under this state of facts as testified to by him the court would have correctly instructed the jury on involuntary manslaughter under the facts of this case had it submitted these instructions without limiting their application to a case where the defendant had the gun for his own self-protection. If the defendant had the gun for the purpose of scaring Brown into returning to him the money which he had previously lost, and while thinking the safety was "on" and the gun would therefore not shoot, and without any intention of injuring or hurting Brown or any one else, he accidentally shot and killed the deceased, he was only guilty of involuntary manslaughter. Under such circumstances the drawing of the gun, unless it constituted the perpetration of a robbery, would be a simple assault which constitutes an unlawful act not amounting to a felony. The court, therefore, should have given this instruction without the limitation complained of. While this was error the case is not reversed on that account, because the de-

fendant himself invited the error by his requested instructions Nos. 1 and 4, wherein he requested the court to give instructions with similar erroneous limitations.

Defendant urges that the court erred in giving general abstract instructions, using ancient and highly technical legal terms not understood by laymen, giving instructions which had no application to the facts in this case, and in not applying the law to the facts which were supported by the evidence, and that the jury was probably misled thereby and the case should be reversed on that account. We have repeatedly criticized the giving of abstract statements of the law to the jury, and held that it is the duty of the court to apply the law to the facts supported by the evidence and to not instruct on any question which is not involved in the case under the evidence. *Herndon* v. *Salt Lake City,* 34 Utah 65, 95 P. 646, 131 Am. St. Rep. 827; *Smith* v. *Clark,* 37 Utah 116, 106 P. 653, 26 L. R. A., N. S., 953, Ann. Cas. 1912B, 1366; *Smith* v. *Cummings,* 39 Utah 306, 117 P. 38, Ann. Cas. 1918E, 129; *Shepherd* v. *Denver & R. G. R. Co.,* 41 Utah 469, 126 P. 692; *Bailey* v. *Spalding-Livingston Co.,* 43 Utah 535, 136 P. 962; *Furkovich* v. *Bingham Coal & Lumber Co.* 45 Utah 89, 143 P. 121, L. R. A. 1915B, 426; *Smith* v. *Cannady,* 45 Utah 521, 147 P. 210; *Pratt* v. *Utah Light & Traction Co.,* 57 Utah 7, 169 P. 868; *Lewis* v. *Davis,* 59 Utah 85, 201 P. 861; *McMaster* v. *Salt Lake Transportation Co.,* 108 Utah 207, 159 P. 2d 121; and *State* v. *Anselmo,* 46 Utah 137, 148 P. 1071. We think that it cannot be too strongly emphasized that the court should apply the law to the facts as they appear from the evidence, and should instruct only on the law which has a bearing on facts, and in stating the necessary elements to constitute the crime charged it should submit to the jury the facts involved in the case and not merely generalizations, and where possible should avoid the use of technical legal terms and cumbersome definitions thereof, by using terms which will readily be understood by laymen. In that way, the jury will be given a much clearer understanding of its problems. Throughout this opinion we have attempted to observe

these rules in our discussion of the legal questions here involved.

Reversed and remanded with instructions to proceed in accordance with this opinion.

McDONOUGH and PRATT, JJ., concur.

LARSON, Chief Justice.

I dissent. The opinion states that as to what is termed "category one" of murder in the first degree there must be "a cool and careful consideration and weighing of the question of whether or not to so kill the deceased." I think the stress put upon a "cool and careful consideration" is misleading and too stringent. That would eliminate all deliberate killings intentional and planned, but in which there was evidence of emotion, sentiment, tension, stress, or impulse. I think the statement of the matter in the Russell case is sufficient, more clear, workable and correct.

I have considerable difficulty in making the evidence as construed in the prevailing opinion bring the case within what is termed "category four." Construing the evidence as done by Mr. Justice Wade, seems to bring the case within the statute making killing in an attempt to perpetrate a robbery, first-degree murder. If his *plan* was to make the players put their money on the table, so he could recoup his loss to Brown from the players' money or otherwise enrich himself from the players' money, not Brown's, that would be robbery. If, however, we construe the evidence— and I think the jury might have done so—to the effect that Thompson got his gun merely to frighten Brown into returning to him the money, out of which he had been cheated, and failing to frighten Brown by flashing the gun, in an effort to intensify to Brown the element of fear, but without a definite intent to kill Brown or any other person, he began shooting recklessly and wantonly, in a room full of people, and in so doing killed Brown, he would be guilty of murder

in the first degree under what the opinion calls "category four."

I definitely dissent from the holding of the opinion that because the court, in explaining to the jury the elements of the second kind of murder in the first degree—designated in the opinion as the fourth category—failed to tell the jury that the discharging of the pistol was intentional, the cause must be reversed. In the instruction referred to (No. 7), the court in defining the elements of this kind of murder said:

"that * * * the defendant, Philip Thompson, *fired* a shot or shots with a pistol and thereby killed Frank Brown;

"that defendant, *when firing* such pistol, *knew that such act* was greatly dangerous to the lives of others, and knew that the natural and probable result *of his firing* was to place the lives of others in jeopardy;

"that *such conduct* of the defendant evidenced". (Italics mine.)

Certainly the italicized words are expressive of only one idea, an act done by Thompson, not a thing accidently occurring.

By instruction No. 13, the court told the jury that if the gun was *accidently discharged* when being exhibited in any angry or threatening manner, defendant would be guilty only of involuntary manslaughter. When you link this instruction with No. 7, it seems the objection made by the prevailing opinion, and upon which it bases its reversal fades into nothingness. I therefore dissent. I think the verdict and judgment should be affirmed.

WOLFE, Justice (dissenting).

I think the instructions were sufficient to apprise the jury that if the defendant, not meaning to fire the gun, had accidently done so he could be guilty of no more than involuntary manslaughter. I do not think that because instruction No. 13 was prefaced with the condition (that if the defendant had a gun for the purpose of his own self-protection) it failed to serve the purpose of informing the jury that a gun not intended to be used to injure or kill

was accidently fired it could at the most amount to criminal negligence and thus be involuntary manslaughter. While it would have been better to leave out that limiting clause, in view of the evidence in this case, I do not think the instruction prejudicial. We have said that in determining prejudice we must view the alleged error in view of the whole case. A slight fault in a close case may be prejudicial whilst in a case where the evidence is such that it would be most unlikely that the jury could have been misled by the error, it would not be prejudicial. *State* v. *Hougensen*, 91 Utah 351, 64 P. 2d 229. In the instant case the evidence of accidental shooting especially after the first shot is so unconvincing that I do not think the conclusion of the limiting clause in instruction No. 13 could have been prejudicial. Moreover, as suggested by the Chief Justice when instruction No. 13 is read in the light of instruction No. 7 the jury was sufficiently informed that the elements required to constitute murder in the first degree founded on depravity and wanton and reckless disregard for the safety of others, must exclude accidental shooting and even such criminal negligence as would constitute only involuntary manslaughter.

I condone the policy of safeguarding the rights of defendants in criminal cases, but if we become too technical and refined in ferreting out defects in instructions which by bare possibility might have misled some jurymen when the evidence is such as to make such defect, in the trenchant phrase of the Chief Justice, "[fade] into nothingness," when viewed by common sense men, we make it almost impossible to conduct jury trials unless the judges are blessed with extraordinary perspicacity.